LUCERO, Circuit Judge.
Roderick Smith was sentenced to death by an Oklahoma state jury for the 1993 murders of his wife and four stepchildren. Before the resolution of Smith's collateral attacks on his convictions and sentence, the Supreme Court issued its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), prohibiting the execution of the intellectually disabled.[1] Smith filed a successor application *1069 in state court for post-conviction relief pursuant to Atkins, and the Oklahoma Court of Criminal Appeals ("OCCA") remanded the case to the Oklahoma County District Court for a jury trial to determine whether Smith was intellectually disabled. At the subsequent jury trial in 2004 (the "Atkins trial"), the jury found Smith was not intellectually disabled and allowed his execution to move forward. But our circuit then granted relief on Smith's previously filed habeas corpus petition in Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004), entitling him to resentencing. A jury found Smith competent to stand trial in 2009, and he was resentenced to death in 2010.
Smith again sought federal habeas relief. The district court denied relief in an unpublished opinion. Smith v. Royal, No. CIV-14-579-R, 2017 WL 2992217 (W.D. Okla. July 13, 2017) (unpublished). Before us, Smith alleges that the state prosecution in his Atkins, competency, and resentencing trials violated several of his constitutional rights, including his Eighth Amendment right against cruel and unusual punishment and his Sixth Amendment right to counsel. Specifically, Smith contends: (1) the Eighth and Fourteenth Amendments prohibit his execution because he is intellectually disabled; (2) the jury instruction requiring a finding that his intellectual disability was "present and known" before the age of eighteen violated Atkins; (3) counsel's failure to call an expert witness to testify about the employment capabilities of the intellectually disabled and prepare an additional adaptive functioning measurement denied him effective assistance of counsel during his Atkins trial; (4) counsel's failure to introduce video footage of Smith into the record denied him effective assistance of trial and appellate counsel in his competency and resentencing trials; and (5) cumulative error violated his rights under the Sixth, Eighth, and Fourteenth Amendments.
Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we reverse the district court's denial of habeas relief on Smith's Atkins challenge to the constitutionality of his execution. Because we grant relief on Smith's Atkins challenge, we need not address Smith's remaining claims concerning his Atkins proceeding. We otherwise affirm the district court's denial of Smith's § 2254 petition for a writ of habeas corpus. We remand with instructions to grant a conditional writ vacating Smith's death sentence and remanding to the State for a new penalty-phase proceeding.
I
A
Smith was convicted of the murder of his wife, Jennifer Smith, and her four children from a prior relationship. The following facts concerning the underlying offense are undisputed and taken from the opinion of the OCCA affirming Smith's convictions and sentences on direct appeal. Smith v. State, 932 P.2d 521, 526 (Okla. Crim. App. 1996).
On the morning of June 28, 1993, Jennifer Smith's mother called the police and asked them to check on her daughter, who had not been seen or heard from for ten days. When the responding officer arrived *1070 at the residence where Smith and Jennifer lived with her four children, he smelled decaying flesh and observed many flies around the windows. The responding officer contacted his supervisor, and the officers entered the house together. They discovered the body of a woman in one closet, and the body of a child in another. The officers requested assistance from the homicide division of the police department, and the bodies of three more children were found. The bodies were identified as those of Jennifer and her four children, and were determined to have been dead for at least two days and up to two weeks.
Later that day, Smith walked into the Oklahoma County Sheriff's Office. He was then arrested by the Oklahoma City Police. Smith was interrogated and admitted that he had stabbed Jennifer and the two male children. Smith also admitted that he "got" the female children, but could not remember any details. He told the police where he had placed each of the bodies.
B
As summarized in Smith's first habeas case, Smith was tried and convicted before an Oklahoma County jury of five counts of first-degree murder. Smith v. Mullin, 379 F.3d at 924. The jury recommended sentences of death on each count, and the Oklahoma court agreed. Smith filed an unsuccessful direct appeal with the OCCA, Smith v. State, 932 P.2d at 539, and the Supreme Court denied his petition for writ of certiorari. Smith v. Oklahoma, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997). He subsequently filed an unsuccessful application for post-conviction relief in the Oklahoma courts. Smith v. State, 955 P.2d 734 (Okla. Crim. App. 1998). Smith did not seek Supreme Court review of the OCCA's denial of post-conviction relief.
Smith then filed his first habeas corpus action, and the district court denied relief. Smith v. Gibson, No. CIV-98-601-R (W.D. Okla. Jan. 10, 2002) (unpublished). Smith appealed to this court. Pending the resolution of that appeal, the Supreme Court held the Eighth Amendment prohibits the execution of the intellectually disabled. Atkins, 504 U.S. at 321, 112 S.Ct. 1904. The state provided Smith a jury trial to prove that he is intellectually disabled, bifurcating the further adjudication of Smith's challenges into an Atkins trial (and subsequent appeals) and the federal habeas claims that developed out of his initial conviction and sentencing.
Smith's first Atkins trial ended in a mistrial, but a state jury eventually concluded that he was not intellectually disabled. Smith appealed to the OCCA, which affirmed the jury's verdict. Smith v. State, No. O-2006-683 (Okla. Crim. App. Jan. 29, 2007) (unpublished) ("OCCA's Atkins Op.").
Shortly after Smith's Atkins trial, however, this court granted in part Smith's habeas petition, entitling Smith to resentencing due to ineffective assistance of counsel. Smith v. Mullin, 379 F.3d 919. We specifically held counsel's failure to introduce any mitigation evidence regarding Smith's intellectual disability, brain damage, and troubled background denied Smith effective assistance of counsel during his sentencing proceedings. Id. at 940-44. Prior to the resentencing proceedings, Smith received a jury trial to determine his competence. The jury found Smith competent, and he was resentenced in 2010. At the resentencing, the jury imposed two death sentences and three sentences of life without the possibility of the parole. Following those jury trials, Smith appealed the resentencing and competency determinations, and the effectiveness of counsel in those proceedings. The OCCA affirmed. Smith v. State, 306 P.3d 557 (Okla. Crim. App. 2013), cert. denied, *1071 572 U.S. 1137, 134 S. Ct. 2662, 189 L.Ed.2d 213 (2014). Smith applied for but failed to obtain post-conviction relief in state court. Smith v. State, No. PCD-2010-660 (Okla. Crim. App. Feb. 13, 2014) (unpublished) ("OCCA's Resentencing and Competency Op.").
Smith then filed a second habeas petition in federal court, bringing claims related to: (1) sufficiency of evidence supporting the jury's determination that he was not intellectually disabled; (2) purported irregularities in his Atkins trial; and (3) ineffective assistance of counsel during his Atkins, competency, and resentencing trials. The district court denied relief on all counts. We granted certificates of appealability as to: (1) sufficiency of evidence as to the jury's determination that Smith was not intellectually disabled at his Atkins trial; (2) his Atkins challenge to language in the jury instructions at that trial; and (3) various effectiveness of counsel claims during his Atkins, competency, and resentencing trials.
II
On appeal from orders denying a writ of habeas corpus, "we review the district court's legal analysis of the state court decision de novo and its factual findings, if any, for clear error." Michael Smith v. Duckworth, 824 F.3d 1233, 1241-42 (10th Cir. 2016) (quotation omitted). But "[t]he Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings." Grant v. Royal, 886 F.3d 874, 888 (10th Cir. 2018) (quotation omitted), cert. denied sub nom. Grant v. Carpenter, --- U.S. ----, 139 S. Ct. 925, 202 L.Ed.2d 659 (2019). Under AEDPA, a petitioner may obtain federal habeas relief on a claim only if the state court's adjudication of the claim on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1), (2).
The Supreme Court has explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quotation omitted). That is, the writ may be granted only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent, id. at 102, 131 S.Ct. 770, and petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," id. at 103, 131 S.Ct. 770.
Applying § 2254(d)(1)'s legal inquiry, "we ask at the threshold whether there exists clearly established federal law, an inquiry that focuses exclusively on holdings of the Supreme Court." Grant, 886 F.3d at 888 (quotation omitted). "The absence of clearly established federal law is dispositive" and requires the denial of relief. Id. at 889 (quotation omitted). And that Supreme Court precedent must have been "clearly established at the time of the [state] adjudication." Shoop v. Hill, --- U.S. ----, 139 S. Ct. 504, 506, 202 L.Ed.2d 461 (2019) (per curiam) (quotation omitted).
"If clearly established federal law exists, a state-court decision is contrary to it if the state applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a *1072 case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Hooks v. Workman, 689 F.3d 1148, 1163 (10th Cir. 2012) (quotation omitted). A state court decision that "identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case" is an "unreasonable application" of clearly established federal law. Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quotation omitted). "In order for a state court's decision to be an unreasonable application of th[e Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." Virginia v. LeBlanc, --- U.S. ----, 137 S. Ct. 1726, 1728, 198 L.Ed.2d 186 (2017) (quotation omitted). Under § 2254(d)(1), we review only the record that was before the state court that adjudicated the claim on the merits. Cullen v. Pinholster, 563 U.S. 170, 180, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).
Applying § 2254(d)(2)'s factual inquiry, we "conclude that a state court's determination of the facts is unreasonable" if "the court plainly and materially misstated the record or the petitioner shows that reasonable minds could not disagree that the finding was in error." Michael Smith, 824 F.3d at 1250. But "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." Brumfield v. Cain, --- U.S. ----, 135 S. Ct. 2269, 2277, 192 L.Ed.2d 356 (2015). And if the petitioner shows "the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." Byrd v. Workman, 645 F.3d 1159, 1171-72 (10th Cir. 2011).
"The § 2254 standard does not apply to issues not decided on the merits by the state court." Welch v. Workman, 639 F.3d 980, 992 (10th Cir. 2011). On those unadjudicated issues, "we review the district court's legal conclusions de novo and its factual findings for clear error." Id. "[I]f the district court based its factual findings" related to issues that the state court did not adjudicate on the merits "entirely on the state court record, we review that record independently." Id.
"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. 86 at 99, 131 S.Ct. 770. But the petitioner may rebut the presumption that the state court adjudicated the petitioner's claim on the merits. As discussed in more detail below, in cases in which a state court addresses only one prong of a multi-prong analysis, the Supreme Court requires that federal habeas courts address the other prongs de novo. See Porter v. McCollum, 558 U.S. 30, 39, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (per curiam) ("Because the state court did not decide whether [petitioner's] counsel was deficient, we review this element of [petitioner's] Strickland claim de novo."); Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the Strickland claim de novo." (citation omitted)); Wiggins, 539 U.S. at 534, 123 S.Ct. 2527 (same); see also Grant, 886 F.3d at 910 ("Because the OCCA did not-by the plain terms of its ruling-reach the prejudice question, we resolve this overarching question de novo."); Hooks, 689 F.3d at 1188 ("[I]n those instances where the OCCA did not *1073 address the performance prong of Strickland and we elect to do so, our review is de novo.").[2]
And as with un-adjudicated prongs of Strickland's two-part analysis, we review un-adjudicated prongs of Atkins' three-part analysis de novo. As the Supreme Court explained in Brumfield, if the relevant state "court never made any finding that [petitioner] failed to produce evidence suggesting he could meet" one of the Atkins prongs, federal habeas courts review that prong of the Atkins analysis de novo because "[t]here is thus no determination on that point to which a federal court must defer in assessing whether [petitioner] satisfied § 2254(d)." 135 S. Ct. at 2282 ; see also Pruitt v. Neal, 788 F.3d 248, 269 (7th Cir. 2015) ("While the [state] court noted that 'the evidence on the adaptive behavior prong is at least conflicting,' it did not actually conclude that [petitioner] failed to establish substantial impairment of adaptive behavior. Thus, we review this prong de novo." (citation omitted)).
III
Smith appeals the district court's denial of habeas relief on five grounds. With respect to his Atkins trial, Smith asserts: (1) he is intellectually disabled and his execution would violate Atkins; (2) flawed jury instructions rendered his Atkins trial fundamentally unfair; and (3) ineffective assistance for his counsel's failures to investigate and call an expert specializing in the employment capabilities of the intellectually disabled, and to refute the State's impeachment of Smith's adaptive functioning measurement. Because we grant habeas relief on Smith's claim that his execution would violate Atkins, we need not address the remaining claims concerning his Atkins trial.
With respect to his competency and resentencing trials, Smith asserts he was *1074 denied effective assistance of trial and appellate counsel for counsel's failure to call Anna Wright, a mental health worker at the Oklahoma County jail, to testify and sponsor the introduction of a video recording of Smith speaking. Smith also asserts cumulative error.
A
Smith first argues he cannot legally be executed pursuant to Atkins because he is intellectually disabled. At the time of Smith's Atkins trial, the OCCA implemented Atkins' prohibition on the execution of the intellectually disabled through its decision in Murphy v. State, 54 P.3d 556 (Okla. Crim. App. 2002), overruled in part on other grounds by Blonner v. State, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). In that case, the OCCA articulated the following definition of intellectual disability:
A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.
Id. at 567-68. Smith contends that based on the evidence presented, a reasonable jury would be compelled to find he was intellectually disabled.
1
Smith argued insufficiency of evidence to the OCCA in his direct appeal from the jury verdict following his Atkins trial. OCCA Atkins Op. at 6. The OCCA concluded that "Smith failed to meet even the first prong of the Murphy definition of mental retardation" because "[t]he evidence, viewed in the light most favorable to the State, portrayed Smith as a person who is able to understand and process information, to communicate, to understand the reactions of others, to learn from experience or mistakes, and to engage in logical reasoning." Id. at 11. Accordingly, to prevail on this sufficiency of evidence challenge, Smith must demonstrate the OCCA's decision that he failed to establish significantly sub-average intellectual functioning was contrary to, or an unreasonable application of, Atkins, or an unreasonable determination of the facts. Hooks, 689 F.3d at 1165 ("A sufficiency-of-the-evidence challenge in a habeas petition presents a mixed question of fact and law .... which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas." (quotation omitted)); see also Brown v. Sirmons, 515 F.3d 1072, 1089 (10th Cir. 2008).[3]
*1075 But the OCCA did not adjudicate on the merits Smith's challenge to the sufficiency of evidence on either the age-of-onset or the deficits in adaptive functioning prongs of Murphy, meaning there exists no state court decision to which we must defer under AEDPA. Grant, 886 F.3d at 888 ("[AEDPA] circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings." (quotation omitted)). Specifically, the OCCA made no mention of the age-of-onset requirement beyond including it in the general definition of intellectual disability in the section of its opinion addressing Smith's sufficiency of evidence challenge. OCCA Atkins Op. at 6-11. And although the OCCA noted "the State presented persuasive evidence from lay witnesses to refute Smith's evidence of ... adaptive functioning deficits," id. at 8, it reached no conclusions regarding the adaptive functioning prong.
Instead, the OCCA's dispositive language rejecting Smith's sufficiency of evidence claim referred only to the first prong of the Murphy definition of intellectual disability, detailing each component of significantly sub-average intellectual functioning and explaining that Smith failed to meet that prong. Id. at 11. The OCCA neither addressed how a rational jury could have viewed the adaptive functioning evidence, nor concluded that the "evidence presented at trial support[ed]" a finding of deficits in adaptive functioning, as it stated for the intellectual functioning prong. Id. And a state court does not adjudicate a claim on the merits without addressing the claim's factual basis. See Fairchild v. Workman, 579 F.3d 1134, 1149 (10th Cir. 2009) ("A claim is more than a mere theory on which a court could grant relief; a claim must have a factual basis, and an adjudication of that claim requires an evaluation of that factual basis." (citation omitted)).
Moreover, the OCCA couches the entirety of its discussion regarding the "persuasive evidence" in terms relevant to the intellectual functioning prong of Murphy, stating the evidence "portrayed Smith as a person who is able to understand and process information, to communicate, to understand the reactions of others, to learn from experiences or mistakes, and to engage in logical reasoning." OCCA Atkins Op. at 11. These are Murphy's intellectual functioning categories. Although they may overlap with the adaptive functioning skills, the psychological terms are different. And even if evidence supporting these intellectual functioning findings could be relevant to the adaptive functioning prong, we cannot ignore the fact that the OCCA addresses this evidence exclusively in the context of Murphy 's definition of the intellectual functioning prong. Compare id. with Murphy, 54 P.3d at 567-68 (defining the intellectual functioning prong as "[i]f he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others"). The OCCA made no attempt to connect the evidence it considered relevant to the intellectual functioning prong to Murphy's adaptive functioning categories. After acknowledging the adaptive functioning categories in a footnote at the beginning of its opinion, see OCCA Atkins Op. at 6 n.8, the OCCA did not mention them at all.
The OCCA's statement that comes closest to adjudicating on the merits the third Murphy prong closely resembles the relevant state court statement in Pruitt. Compare 788 F.3d at 269 ("the evidence on the adaptive behavior prong is at least conflicting")
*1076 with OCCA Atkins Op. at 8 ("the State presented persuasive evidence from lay witnesses to refute Smith's evidence of subaverage intellectual function and of adaptive functioning deficits"). As the Seventh Circuit similarly concluded, such a cursory reference to the evidence presented absent any conclusion does not constitute an adjudication on the merits. Pruitt, 788 F.3d at 269. We determine the OCCA resolved the intellectual disability issue on the intellectual functioning prong and did not address the other two prongs of the Murphy test.
As explained above, if the state court explicitly relies on one element of a multi-element test to the exclusion of others, we review challenges to the remaining elements de novo. See Brumfield, 135 S. Ct. at 2282 (holding when relevant state "court never made any finding that [petitioner] failed to produce evidence suggesting he could meet" one of the Atkins prongs, federal habeas courts review that prong de novo because "[t]here is thus no determination on that point to which a federal court must defer in assessing whether [petitioner] satisfied § 2254(d)"); Pruitt, 788 F.3d at 269. Accordingly, although we grant AEDPA deference to the OCCA's determination on the first Murphy prong, we review de novo Smith's sufficiency of evidence challenge to the age-of-onset and deficits in adaptive functioning prongs.[4]
The proper standard as to the latter two prongs are thus set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), as explicated in Hooks: "whether, viewing the evidence in the light most favorable to the prevailing party (the State), any rational trier of fact could have found [Smith] not mentally retarded by a preponderance of the evidence." Hooks, 689 F.3d at 1166 (emphasis in original). And because the district court "based its factual findings" in rejecting Smith's claims "entirely on the state court record, we review that record independently." Welch, 639 F.3d at 992 (quotation omitted).
2
In addressing the Murphy prongs, we first conclude Smith has demonstrated the OCCA either unreasonably applied Atkins or unreasonably construed the facts in deciding the evidence justified the jury's verdict regarding the intellectual functioning prong of Murphy. Next, as the State conceded at oral argument, Smith met the age-of-onset Murphy prong, and that prong thus does not provide a viable justification for upholding the jury's determination that Smith was not intellectually disabled. Finally, we conclude Smith has successfully demonstrated that based on the evidence presented, a reasonable jury would have been compelled to find that he suffers from deficiencies in at least two of the nine listed skill areas of adaptive functioning. We thus reverse the district court's denial of this claim.
a
The first Murphy prong requires Smith prove by a preponderance of evidence that he "functions at a significantly sub-average intellectual level that substantially limits *1077 his [ ] ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others." 54 P.3d at 567-68. Because the OCCA adjudicated the first Murphy prong on the merits, AEDPA constrains our review of its finding Smith failed to meet "the first prong of the Murphy definition," OCCA Atkins Op. at 11.
But this is not an insurmountable barrier. Even under AEDPA's deferential review, at least four of our sibling circuits have held unreasonable a state court's determination that an individual was not intellectually disabled, or that an individual failed to meet a particular prong of the relevant definition of intellectual disability. Pruitt, 788 F.3d at 269 ("The [state court] made an unreasonable determination of fact in concluding ... that [petitioner] failed to establish significantly subaverage intellectual functioning."); Van Tran v. Colson, 764 F.3d 594, 612 (6th Cir. 2014) ("In light of the methods and analyses employed by the expert witnesses, the [state court] unreasonably determined that Van Tran was not intellectually disabled."); Burgess v. Comm'r, Ala. Dep't of Corr., 723 F.3d 1308, 1315-16 (11th Cir. 2013) ("[T]he ruling of [the state court] that Burgess is not mentally retarded was an unreasonable determination of the facts in this case." (quotation omitted)); Rivera v. Quarterman, 505 F.3d 349, 357 (5th Cir. 2007) ("[I]t was unreasonable ... to reject Rivera's Atkins claim as failing to even establish a prima facie case-especially when viewed through the prism of Atkins' command that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." (quotations omitted)).
Because Smith's sufficiency of evidence challenge "presents a mixed question of fact and law," we will grant relief if the OCCA's decision to uphold the jury determination on the first Murphy prong was contrary to, or an unreasonable application of, Atkins, or was an unreasonable determination of the facts. Hooks, 689 F.3d at 1165. The Court's decision in Atkins provides the "substantive law at this basis of his sufficiency challenge." Hooks, 689 F.3d at 1166. Atkins broadly imposed a "substantive restriction on the State's power to take the life of a mentally retarded offender." 536 U.S. at 321, 122 S.Ct. 2242. The Supreme Court in Atkins accepted clinical definitions for the meaning of the term "mentally retarded." Id. at 308 n.3, 314-16, 122 S.Ct. 2242. And although Atkins left the primary task of defining intellectual disability to the states, Smith's "sufficiency challenge inescapably requires that we consider the kinds of evidence that state courts may (or may not) rely upon in adjudicating an Atkins claim." Hooks, 689 F.3d at 1166. Atkins clearly establishes that intellectual disability must be assessed, at least in part, under the existing clinical definitions applied through expert testimony. Atkins, 536 U.S. at 308 n.3, 122 S.Ct. 2242.[5]
We recognized the centrality of expert testimony to our review of Atkins verdicts in Hooks. In that case, the defendant's IQ test scores ranged from 53 to 80. The experts testified that he fell into a "gray area." Hooks, 689 F.3d at 1168. With a range of expert testimony, the court saw no reason to overturn the jury's finding of not intellectually disabled. Id. And other circuits similarly prioritize expert testimony *1078 in review of Atkins challenges. In granting habeas relief pursuant to Atkins in Pruitt, the Seventh Circuit explained that four "highly qualified experts with extensive experience with the intellectually disabled ... all agreed that the [petitioner's] IQ scores demonstrated significantly subaverage intellectual functioning and that [petitioner] is intellectually disabled." 788 F.3d at 267. And, as in this case, the State's expert in Pruitt could not claim with certainty that the petitioner is not intellectually disabled. Id. Applying Atkins, both Pruitt and Hooks turned on consideration of expert opinions.
As in Hooks, id. at 1167, the OCCA applied the correct legal standard in this case, explaining that "[w]hen a defendant challenges the sufficiency of evidence following a jury verdict finding him not mentally retarded, [the OCCA] reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion." OCCA Atkins Op. at 6. "Because the OCCA applied the correct legal standard, our inquiry is limited to whether its determination that the evidence was sufficient to support the jury's verdict was reasonable ... [T]hat inquiry also requires us to consider whether the OCCA ... reasonably applied Atkins." Hooks, 689 F.3d at 1167 (quotation omitted).
We conclude that in holding Smith failed to satisfy the intellectual functioning Murphy prong, the OCCA either relied upon an unreasonable determination of the facts or unreasonably applied Atkins. Every IQ test Smith took placed him firmly within the intellectually disabled range. The sub-average intellectual ability requirement generally turns on IQ scores. See id. at 1167-68 ("[A] capital defendant's IQ score is ... strong evidence of sub-average intelligence."); American Association on Mental Retardation ("AAMR"), Mental Retardation: Definition, Classification, and Systems of Supports at 58 (10th ed. 2002) ("In the 2002 AAMR system, the 'intellectual functioning' criterion for diagnosis of mental retardation is approximately two standard deviations below the mean, considering the [standard error of measurement] for the specific assessment instruments used and the instruments' strengths and limitations.").[6] As the Supreme Court explained in Atkins, "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." 536 U.S. at 309 n.5, 122 S.Ct. 2242 ; see also Michael Smith, 824 F.3d at 1243 (explaining that "a clinical diagnosis of intellectual disability generally requires an IQ score that is approximately two standard deviations below the mean .... The mean score for a standardized IQ test is 100, and the standard deviation is approximately 15.").
In light of Smith's consistent scoring in the intellectually disabled range and the Supreme Court's clear statements regarding the significant role of IQ assessments under the intellectual functioning prong of Atkins, for the OCCA's decision to withstand review there must be evidence that either: (1) all of the IQ assessments administered to Smith significantly underestimate his intellectual functioning; or (2) contrary to the clinical definitions of the intellectual functioning prong at the time of Smith's Atkins trial, expert assessments relying upon standardized metrics are not dispositive. The State cannot prevail on either basis. The former requires an unreasonable construction of the facts; the *1079 latter an unreasonable application of Atkins.
Three experts testified at Smith's Atkins trial: Dr. Clifford Allen Hopewell, a clinical neuropsychologist retained by Smith; Dr. Frederick H. Smith, a psychologist with the Oklahoma Department of Corrections initially retained by the State for Smith's first habeas petition but called to testify as an expert for Smith at his Atkins trial; and Dr. John A. Call, a forensic psychologist retained by the State. The doctors' opinions largely track the clinical and legal definitions of intellectual disability set forth in Murphy. Both Dr. Hopewell and Dr. Smith concluded Smith was intellectually disabled. And Dr. Hopewell testified that Smith's "case is pretty obvious." Dr. Call suggested Smith was malingering but admitted he could not "say that [Smith] is not mentally retarded." In other words, although Dr. Call challenged the accuracy of some of Smith's tests, even Dr. Call could not conclusively contradict the ultimate diagnosis of intellectual disability.
And Smith's IQ scores, all of which place him in the intellectually disabled range, strongly compel a finding of significant deficits in intellectual functioning. Unlike in previous cases in which we denied relief on the intellectual functioning prong, not even one of Smith's IQ scores falls outside the intellectually disabled range "between 70 and 75 or lower," Atkins, 536 U.S. at 309 n.5, 122 S.Ct. 2242 ; see Hooks, 689 F.3d at 1168 n.7 (noting petitioners IQ scores of: 80, 70, 61, 57, 61, 80, 72, 76, and 53, determining the 72 and 76 to be most reliable); Michael Smith, 824 F.3d at 1244 (noting petitioner's IQ scores of 76, 79, and 71). In this case, the IQ scores addressed by the OCCA in its opinion were: 65 on the Wechsler Adult Intelligence Scale-Revised (WAIS-R); 55 on the Wechsler Adult Intelligence Scale-III (WAIS-III); 55 (WAIS-III); 69-78 on the Raven's Standard Progressive Matrices, which provide a range rather than fixed score; and 73. OCCA Atkins Op. at 7-8.[7]
Of the scores presented at Smith's Atkins trial and to the OCCA, the 55 scores were obtained by Dr. Hopewell, one of Smith's experts, and Dr. Call, the State's expert, roughly nine months apart. Dr. Hopewell administered the WAIS-III to Smith in January 2003, and obtained a Verbal IQ interval of 51-61, a Performance IQ interval of 59-73, and a full scale interval of 52-60. Dr. Call's administration of the same assessment nine months later produced not only an identical full scale score of 55, but also similar intervals. Dr. Call obtained a Verbal IQ interval of 53-63, a Performance IQ interval of 58-71, and a full scale interval of 52-60. Dr. Call's administration of the assessment produced age-adjusted scales either identical to or within one point of Dr. Hopewell's administration in nine of the eleven areas the WAIS-III measures.
Dr. Smith administered the WAIS-R and the Raven's Standard Progressive Matrices to Smith in 1997, five years prior to the Supreme Court's decision in Atkins.[8]
*1080 On the WAIS-R assessment, Smith's Verbal IQ score was 64, his Performance IQ was 70, and full scale IQ was 65. Dr. Smith testified that the score indicated Smith was intellectually disabled.[9] With regard to the Raven's Standard Progress Matrices, Dr. Smith testified that assessment provides a range, rather than a fixed score like the WAIS assessments, and Smith obtained a range of 69 to 78. When asked to compare the assessments' accuracy, Dr. Smith unequivocally stated the WAIS "is the premier instrument used throughout the world for IQ measurement."
Finally, the 73 results from a test administered in preparation for Smith's original criminal trial in 1994. Smith notes that the type of test administered to obtain the 73 is unclear. Dr. Call's testimony provides the only source for the score in the Atkins trial record, noting that Dr. Murphy administered the test in 1994. The transcript from Smith's original criminal trial includes testimony from Dr. Murphy that Smith's full scale IQ is 73, and "in the mentally retarded range of intellectual functioning." At no point in his testimony did Dr. Murphy state what type of test was administered, and he did not testify at Smith's Atkins trial. Accordingly, although we note the score obtained by Dr. Murphy for its consistent placement of Smith in the intellectually disabled range, we do not consider a score on an unknown test and only introduced into the Atkins trial record indirectly to be of particular significance to our review.[10]
In view of the evidence showing Smith's consistent low IQ scores and Atkins' statement that a score of 75 or lower will generally satisfy the intellectual functioning prong of an intellectual disability diagnosis, the State must provide some basis for a reasonable juror to believe that every single one of Smith's IQ assessments was inaccurate, and that his actual IQ was some ten to fifteen points higher than his scores indicate. The OCCA dismissed the relevance of these scores consistently placing Smith in the intellectually disabled range by first emphasizing Dr. Call's testimony that Smith was likely malingering. OCCA Atkins Op. at 8. But to the extent the OCCA determined Smith failed to satisfy the intellectual functioning Murphy prong because he was malingering, we conclude such a determination amounts to an unreasonable factual conclusion. Byrd, 645 F.3d at 1171-72 (10th Cir. 2011) (explaining that in cases where the state *1081 courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable" (quotation omitted)).
As explained supra, Smith has consistently scored in the intellectually disabled range on every IQ test he has taken. And Smith almost certainly scored in that range when he was first placed in courses for the educable mentally handicapped while in grade school, as special education instructors from his school testified that placement in such courses required IQ testing in the intellectually disabled range. Dr. Hopewell testified that children would not fake an intellectual disability for placement in the educable mentally handicapped courses. Two of Smith's high school teachers testified that Smith was one of the lower functioning students in their educable mentally handicapped courses.
As all three experts expressly testified, Smith's consistent placement in the intellectually disabled range provides compelling evidence that he was not malingering. Dr. Hopewell testified that Smith's consistent scoring across a wide range of tests and his prior experience with the intellectually disabled refuted any claims that Smith was malingering. Dr. Smith testified that Smith's scores from 1997 through 2003 demonstrate a "remarkable" consistency difficult to reconcile with a malingering diagnosis. And Smith obtained the 65 score in 1997 on the assessment that Dr. Smith administered, five years prior to the Supreme Court's decision in Atkins, calling into question any purported motivation for malingering. Even the State's expert, Dr. Call, agreed that comparing test performance on the same or similar tests over time would provide one way of assessing whether an individual was malingering. Moreover, as the Seventh Circuit explains, "a defendant cannot readily feign the symptoms of mental retardation." Newman v. Harrington, 726 F.3d 921, 929 (7th Cir. 2013) (quotation omitted).
The State's assertion that Smith was malingering thus rests on Dr. Call, the sole expert to so testify. Unlike Dr. Hopewell, who had extensive experience with both the intellectually disabled and malingering patients, Dr. Call had no prior experience with the intellectually disabled and practiced almost exclusively in the unrelated field of forensic psychology. See Lambert v. State, 126 P.3d 646, 651-52 (Okla. Crim. App. 2005) ("Dr. Call is a forensic psychologist. His practice has not primarily been in the field of mental retardation, and he has not had a mentally retarded patient in a clinical setting for fifteen years. However, since 2002 he has made a specialty of examining capital defendants for mental retardation."). The OCCA had previously chastised Dr. Call because he "himself made up and administered a non-standardized test ... not administered pursuant to accepted scientific norms ... to convince the jury Petitioner was malingering." Salazar v. State, 126 P.3d 625, 632 (Okla. Crim. App. 2005). Moreover, Dr. Call could not conclude that Smith is not intellectually disabled. Presented with the testimony of two experts who concluded Smith was intellectually disabled, Dr. Call could only state that the record established that Smith had neither an intellectual disability nor an absence thereof. And the OCCA noted an identical admission from Dr. Call to deemphasize his malingering diagnosis in concluding a defendant met the first Murphy prong in Lambert. 126 P.3d at 651 ("Dr. Call did not testify that Lambert was not mentally retarded. In fact, he explicitly stated he could not say that Lambert was not mentally retarded.").
*1082 The OCCA also emphasized Dr. Call's testimony that the tests he and Dr. Hopewell administered to assess malingering demonstrate "Smith did not put forth his best efforts during his and Dr. Hopewell's testing and that Smith's I.Q. test results were unreliable." OCCA Atkins Op. at 8. Dr. Call testified that the Test of Memory and Malingering and 15-Item Memory Test both demonstrated Smith was malingering. Dr. Hopewell disputed this conclusion, testifying the assessments of malingering that he and Dr. Call administered would not accurately assess the intellectually disabled.
Even if the OCCA had used the malingering assessments to disregard Smith's scores (both 55) on the WAIS-III assessments, Smith still averaged a 69 on the remaining fixed score assessments. For a reasonable jury not to be compelled to conclude that Smith satisfied the first Murphy prong based on the malingering assessments, there must exist some basis for the jurors to infer that Smith's actual IQ falls outside the intellectually disabled range. But every score presented refuted such an inference. And "[w]hile the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." Torres v. Lytle, 461 F.3d 1303, 1313 (10th Cir. 2006).
The OCCA's conclusion that Smith "failed to meet even the first prong of the Murphy definition," OCCA Atkins Op. at 11, is thus an unreasonable determination of the facts in light of Smith's consistent IQ scores that demonstrate significantly subaverage intellectual functioning. See Pruitt, 788 F.3d at 267 ("Even when viewed through AEDPA's deferential lens, the [state court's] determination that [petitioner] failed to demonstrate significantly subaverage intellectual functioning ... was objectively unreasonable .... The record establishes that [petitioner's] reliable IQ scores consistently demonstrated significantly subaverage intellectual functioning.").[11]
The OCCA attempted to justify its disregard for Smith's consistent IQ scores by explaining "the State presented persuasive evidence from lay witnesses to refute Smith's evidence of subaverage intellectual functioning." OCCA Atkins Op. at 8. But to the extent that the OCCA determined Smith failed to satisfy the intellectual functioning Murphy prong because of evidence from lay witnesses, such a determination constitutes an unreasonable application of Atkins. See Wiggins, 539 U.S. at 520, 123 S.Ct. 2527.
Atkins demands the Eighth Amendment's prohibition of the execution of the mentally disabled tracks the "national consensus [that] developed against" the execution of "offenders possessing a known IQ less than 70." Atkins, 536 U.S. at 316 & 309 n.5, 122 S.Ct. 2242 ("[A]n IQ between 70 and 75 or lower ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."). The Diagnostic and Statistical Manual of Mental Disorders, cited by the Atkins court, id. at 308 n.3, 122 S.Ct. 2242, is even more explicit: "Intellectual functioning *1083 is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual for Mental Disorders at 37 (4th ed.-Text Rev. 2000). And, citing Atkins, we have similarly concluded that "[a]n IQ score of 70 or below ... is [ ] strong evidence of subaverage intelligence." Hooks, 689 F.3d at 1168. This court has noted that "[t]he [Supreme] Court in Atkins ... base[d] its analysis on clinical definitions of intellectual disability, and the [Supreme] Court has since recognized that such definitions were a fundamental premise of Atkins." Michael Smith, 824 F.3d at 1243.
Therefore, the OCCA's determination Smith did not satisfy the first prong of the Murphy definition constitutes either an unreasonable determination of the facts, or amounts to an unreasonable application of Atkins because such determination requires the OCCA to have disregarded the clinical definitions Atkins mandated states adopt. We conclude the OCCA erred in determining a reasonable jury would not have been compelled to find Smith intellectually disabled.
b
The State conceded at oral argument that there exists insufficient evidence for a reasonable jury to conclude that Smith's symptoms did not manifest before the age of eighteen. The record supports the State's concession: throughout his schooling, Smith was placed in educable mentally handicapped courses, and placement in those courses required Smith submit to a psychometrist-administered test and score a full scale IQ in the intellectually disabled range. Two of Smith's teachers from his educable mentally handicapped courses confirmed that his placement in those classes was appropriate. We accordingly conclude that Smith's sufficiency of evidence challenge prevails with regards to the age-of-onset prong of the Murphy definition of intellectual disability.
c
Finally, Smith must demonstrate that a rational jury would have been compelled to find he satisfied the adaptive functioning prong of the Murphy analysis: "that he has significant limitations in adaptive functioning in at least two of the nine listed skill areas." OCCA Atkins Op. at 6. As explained by the OCCA, the "adaptive functioning skill areas are: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work." Id. at 6 n.8. Because the OCCA did not adjudicate this prong of Murphy on the merits, we review the evidence and conduct the legal analysis de novo. Brumfield, 135 S. Ct. at 2282.
Under de novo review, we are not constrained to consider only Supreme Court precedent "clearly established at the time of the [state] adjudication," as required under AEDPA. Shoop, 139 S. Ct. at 506. We thus apply the general rule for retroactive application of law to convictions under collateral attack to assess whether the Supreme Court's recent applications of Atkins "are novel." Chaidez v. United States, 568 U.S. 342, 348, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013).
In general, "[o]nly when we apply a settled rule may a person avail herself of the decision on collateral review." Id. at 347, 133 S.Ct. 1103. To determine whether a post-conviction constitutional rule applies to a case on collateral review, the court must first "determine when the defendant's conviction became final." Beard v. Banks, 542 U.S. 406, 411, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). It then must decide "whether the rule is actually 'new.' " Id. Typically, a rule is "new" if it either *1084 "breaks new ground or imposes a new obligation on the States or the Federal Government," or its "result was not dictated by precedent existing at the time the defendant's conviction became final." Teague v. Lane, 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). A result is not dictated by precedent if "reasonable jurists could have differed as to whether [precedent] compelled" the result. Beard, 542 U.S. at 414, 124 S.Ct. 2504. If the rule is not new, the petitioner may "avail herself of the decision on collateral review." Chaidez, 568 U.S. at 347, 133 S.Ct. 1103. But "if the rule is new," it is not retroactively applicable on collateral review unless "it falls within either of the two exceptions to nonretroactivity." Beard, 542 U.S. at 414, 124 S.Ct. 2504.
When the Supreme Court "appl[ies] a general standard to the kind of factual circumstances it was meant to address, [it] will rarely state a new rule." Chaidez, 568 U.S. at 348, 133 S.Ct. 1103. And the Supreme Court's post- Atkins jurisprudence has expressly confirmed that its reliance on the clinical standards endorsed in Atkins constitutes a mere application of that case. We thus conclude these cases do not state a new rule. As the Supreme Court explained in Hall:
Atkins did not give the States unfettered discretion to define the full scope of the constitutional protection. The Atkins Court twice cited definitions of intellectual disability .... Atkins itself not only cited clinical definitions for intellectual disability but also noted that the States' standards, on which the Court based its own conclusion, conformed to those definitions .... The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of Atkins ... If the States were to have complete autonomy to define intellectual disability as they wished, the Court's decision in Atkins could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality. This Court thus reads Atkins to provide substantial guidance on the definition of intellectual disability.
572 U.S. at 720-21, 134 S.Ct. 1986 (emphasis added); see also Michael Smith, 824 F.3d at 1243 ("The Court in Atkins did, however, base its analysis on clinical definitions of intellectual disability."); Hooks, 689 F.3d at 1166 ("[T]he definition of mental retardation ... although dependent on state law (here, Murphy ), ultimately has Eighth Amendment underpinnings pursuant to Atkins."). And the Supreme Court reiterated this reading of Atkins in Moore v. Texas (Moore II ), --- U.S. ----, 139 S. Ct. 666, --- L.Ed.2d ---- (2019), explaining that "[w]hile our decisions in Atkins and Hall left to the States the task of developing appropriate ways to enforce the restriction on executing the intellectually disabled, a court's intellectual disability determination must be informed by the medical community's diagnostic framework." Id. at 669 (citations and quotations omitted).
As in Strickland, the Supreme Court in Atkins declared "a rule of general application ... designed for the specific purpose of evaluating a myriad of factual contexts." Chaidez, 568 U.S. at 348, 133 S.Ct. 1103 (quotation omitted). The application of this general rule to Hall, Moore v. Texas (Moore I ), --- U.S. ----, 137 S. Ct. 1039, 197 L.Ed.2d 416 (2017), and Moore II cannot be understood to "yield[ ] a result so novel that it forges a new rule, one not dictated by precedent", Chaidez, 568 U.S. at 348, 133 S.Ct. 1103 (quotation omitted), in light of the Court's proclamation in Hall that " Atkins ... provide[s] substantial guidance on the definition of intellectual disability," 572 U.S. at 721, 134 S.Ct. 1986. The Court's application of Atkins more closely resembles, for example, our conclusion *1085 that the extension of Strickland's guarantee of effective counsel to the plea-bargaining context merely applied Strickland rather than created a new rule. In re Graham, 714 F.3d 1181, 1183 (10th Cir. 2013) (per curiam).
Accordingly, we consider on de novo review the Supreme Court's application of Atkins in Hall, Moore I, and Moore II. The Court's decisions in Moore I and Moore II, which directly address the adaptive functioning component of the clinical definitions that Atkins mandated, make clear that no reasonable jury could conclude Smith failed to establish by a preponderance of evidence that he suffered deficits in at least two areas of adaptive functioning, with the most compelling evidence concerning academics and communication. And the State conceded at oral argument that Smith demonstrated significant limitations in adaptive functioning in the academics category.
Dr. Hopewell, the only expert to conduct a formal assessment of Smith's adaptive functioning capacities, concluded Smith suffers from profound deficits in at least five of the nine adaptive functioning areas: communication; academics; social skills; home living; and health and safety. Dr. Hopewell based this assessment on the Vineland Adaptive Behavior Scales assessment; his own interactions with Smith; and his review of Department of Corrections testing on Smith's adaptive functions, which revealed significant deficits in reading, writing, and personal finances (placing Smith at the third and fifth grade levels). With regard to Smith's significant communication deficits, Dr. Hopewell noted that Smith could not keep a cellmate because his fellow prisoners would become bored with his lack of engagement, and frustrated that he spent much of his time completing grade-school level coloring books.[12]
Dr. Hopewell also administered the Wide Range Achievement Test III (WRAT-III), intended to assess an individual's ability in reading, writing, and arithmetic to substantiate the finding of significant deficits in the functional academics category of adaptive functioning. Smith scored at the kindergarten or first grade level in each academic area, at or below two standard deviations from the mean. Dr. Hopewell characterized Smith as functionally illiterate, unable to read more than a few words at a very basic level.
And Smith's teachers from high school confirmed his illiteracy, with one teacher testifying that she never asked Smith to read aloud because of his illiteracy, and another stating it was "very, very likely" that he graduated high school without having learned to read. Smith was unable to fill out job applications without the assistance of his teachers. Evidence of Smith's adult illiteracy arose out of his employment; one teacher in the school where Smith worked as a custodian noted that he was unable to read notes containing special cleaning requests. And we noted the evidence that "Smith is completely illiterate" in resolving Smith's first habeas petition. Smith v. Mullin, 379 F.3d at 941.
Only Smith presented a standardized assessment of his adaptive behavior; contrary to the AAMR's recommendations, the State neither conducted nor presented *1086 a single standardized assessment of Smith's adaptive behavior. AAMR, Mental Retardation: Definition, Classification, and Systems of Supports at 83 (10th ed. 2002) ("Regardless of the purpose of diagnosis ... adaptive behavior should be measured with a standardized instrument that provides normative data on people without mental retardation."). The evidence Smith presented, including the only formal assessment of his deficits in adaptive functioning corroborated by expert testimony and testimony from Smith's teachers and colleagues about his deficits, thus overwhelmingly supports Smith's claim that he satisfies the third Murphy prong.
The evidence the State emphasizes on appeal to refute Smith's adaptive functioning argument carries little weight in light of the Supreme Court's warnings against undue emphasis on "perceived adaptive strengths," Moore I, 137 S. Ct. at 1050, and "lay stereotypes of the intellectually disabled," id. at 1052. As the Supreme Court explained in Moore I:
[T]he medical community focuses the adaptive-functioning inquiry on adaptive deficits. E.g., AAIDD-11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits).
Id. at 1050 (alterations in original); see also Brumfield, 135 S. Ct. at 2281 ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.' " (quoting AAMR, Mental Retardation: Definition, Classification, and Systems of Supports at 8 (10th ed. 2002))).
Evidence that rests on lay stereotypes about the intellectually disabled, such as the incorrect stereotypes that they cannot have jobs or relationships, is similarly disfavored. See Moore II, 139 S. Ct. at 672. As the Court explained in Moore I, "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled" and "[t]hose stereotypes, much more than medical and clinical appraisals, should spark skepticism." 137 S. Ct. at 1052. In light of the Supreme Court's admonitions against consideration of adaptive strengths and lay stereotypes, no rational jury could decide that Smith failed to demonstrate by a preponderance of evidence deficits in adaptive functioning. All the evidence emphasized by the State falls into one or both of those two disfavored categories.
The State first emphasizes the testimony of Smith's former prison case manager, Watts, who testified that Smith could communicate with her and "use manipulative behavior to get a more desirable cell or cellmate." However, Watts has no experience with intellectual disabilities, and the State's own expert acknowledged at the proceeding that the intellectually disabled can lie. Additionally, the Supreme Court has "caution[ed] against reliance on adaptive strengths developed in prison." Moore II, 139 S. Ct. at 671 (quotation omitted); Moore I, 137 S. Ct. at 1050 (citing DSM-5 for the proposition that "[a]daptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained").
Reliance on the testimony of Smith's insurance agent and work supervisor by the State is similarly unavailing. As with Smith's prison case manager, these individuals have no experience in diagnosing intellectual disability, and based their opinions *1087 exclusively on lay stereotypes. Moreover, the testimony of Smith's insurance agent concerned two interactions with Smith over ten years earlier cumulatively taking roughly an hour. The mere fact that Smith's insurance company wanted to hire him, or that his work supervisor did not have problems with Smith's performance of his work duties, is of limited significance. The Supreme Court has repudiated the notion that persons with intellectual disability "never have ... jobs" when "it is estimated that between nine and forty percent of persons with intellectual disability have some form of paid employment." Moore II, 139 S. Ct. at 672 (citations and quotations omitted). Even if clinically informed, evidence of perceived adaptive strengths such as the ability to hold down a job does not constitute "evidence adequate to overcome ... objective evidence of [the individual's] adaptive deficits." Moore I, 137 S. Ct. at 1050. As Dr. Hopewell explained in his testimony, a work-related deficit in adaptive functioning does not require the individual be incapable of work; instead, the deficit is assessed against the population in general, the overwhelming majority of which can perform work at a much higher level than can Smith.
Reference to the testimony of an assistant district attorney from the team that prosecuted Smith's initial criminal trial does not overcome the strong medical evidence of significant deficits in adaptive functioning. The assistant district attorney testified that Smith filed and presented several motions on his behalf, and made good arguments in support of those motions. But one of those motions was a request that the prosecutor's table be moved because Smith thought the prosecutor was making faces at him, which the prosecutor denied making at the Atkins trial. And the Supreme Court has warned against using papers an individual files in court as convincing evidence of communication skills, especially where, as in this case, evidence suggests the papers were written by a cellmate. See Moore II, 139 S. Ct. at 671 (noting such evidence "lacks convincing strength without a determination about whether [the individual] wrote the papers on his own"). Further, Smith's counsel from his criminal trial refuted the State's suggestion that Smith played any role in his own defense, testifying that Smith spent most of the trial drawing and did not have "much of a clue about what was going on."
The State next emphasizes Smith's relationship with Laura Dich to refute Smith's evidence of deficits in adaptive functioning. Such emphasis further evinces impermissible "reliance upon ... lay stereotypes of the intellectually disabled," as the Court has warned against adopting the "incorrect stereotypes that persons with intellectual disability never have [relationships]." Moore II, 139 S. Ct. at 672 (quotations omitted). And the State makes no efforts on appeal to provide any scientific or clinical justifications that would render meaningful evidence of Smith's relationships.[13] Even if we were to accept the lay stereotype evidence above as relevant, the State's failure to connect that evidence to any areas of adaptive functioning renders the evidence uncompelling in this context. See Van Tran, 764 F.3d at 612 ("[T]he [state court] unreasonably determined that Van Tran was not intellectually disabled.
*1088 The [state court] emphasized too heavily in its analysis the facts of the crime, which are not relevant to the analysis of most of the areas of adaptive behavior, especially that of functional academics.").
In sum, Atkins and its progeny prohibit states from "disregard[ing] established medical practice." Moore I, 137 S. Ct. at 1049 (alteration in original). "[O]ur precedent [does not] license disregard of current medical standards." Id. And our review of the record indicates Smith could only fail to establish by a preponderance of evidence significant deficits in adaptive functioning in at least two of the enumerated areas if the jury disregarded medical standards in favor of lay stereotypes and undue emphasis on adaptive strengths in the precise manner prohibited by the Supreme Court in Moore I and Moore II. Only speculation or conjecture based on lay stereotype could support a jury verdict finding Smith failed to demonstrate significant deficits in adaptive functioning. And "[w]hile the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." Torres, 461 F.3d at 1313 (quotation omitted).
Because Smith has demonstrated a reasonable jury would have been compelled to conclude he satisfied all three prongs of the Murphy test, we reverse the district court's denial of his habeas petition for relief on this claim.
B
Because we grant habeas relief on Smith's sufficiency of evidence Atkins challenge, we do not need to address Smith's Atkins challenge to the "present and known" jury instruction or his claims of ineffective assistance of counsel at his Atkins proceedings. See Pruitt, 788 F.3d at 270 ("[Petitioner] raises three alleged errors in support of his ineffective-assistance-of-counsel claim, but we need address only one-whether trial counsel was ineffective at the penalty phase in investigating and presenting evidence that [petitioner] suffered from paranoid schizophrenia."). Were we to grant Smith relief on those claims, the appropriate remedy would entitle Smith to relitigate intellectual disability at a new Atkins trial. But we hold Smith is intellectually disabled as a matter of law and therefore constitutionally ineligible for execution. Accordingly, any relief we could grant on Smith's remaining claims concerning his Atkins trial would be meaningless because the State is not permitted to conduct a new Atkins trial.[14]
We must nevertheless consider Smith's ineffective assistance of counsel claim concerning counsel's representation at the competency and resentencing trials. The relief Smith seeks on that claim could require the OCCA to vacate his sentences and order a new competency trial. Only if Smith were found competent could the OCCA then order resentencing, including on Smith's three murder convictions for which he was not sentenced to death. Accordingly, *1089 we address this claim and affirm the district court's denial of habeas relief.
Smith argues his counsel at the competency and resentencing trials, and attendant direct appeal, was constitutionally ineffective for failing to present to the jury a video recording of an interview with Smith, which he contends would have shown his humanity and intellectual disability. Specifically, Smith argues that counsel was ineffective in these proceedings for failing to call Anna Wright, a mental health worker at the Oklahoma County jail, to testify and sponsor the introduction of a video recording of Smith speaking. Wright assisted in a video interview of Smith conducted in preparation for one of Smith's prior cell mate's clemency hearing. Smith claims this video would have made clear his intellectual disability and demonstrated his humanity to the juries in those proceedings. Smith also attaches an auxiliary ineffective assistance of appellate counsel claim to this failure, arguing his appellate counsel at resentencing was ineffective for failing to raise the deficiency of his trial counsel on direct appeal.
1
The Sixth Amendment guarantees a criminal defendant "the right ... to have Assistance of Counsel for his defense." U.S. Const. amend. VI. Criminal defendants' constitutional right to counsel encompasses post-conviction Atkins proceedings. Hooks, 689 F.3d at 1184. ("We have concluded that defendants in Atkins proceedings have the right to effective counsel secured by the Sixth and Fourteenth Amendments.").
The right to counsel requires a minimum quality of advocacy from a professional attorney. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant can establish a constitutional violation of the right to counsel where "counsel's performance was deficient," and "the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. 2052. "These two prongs may be addressed in any order, and failure to satisfy either is dispositive." Hooks, 689 F.3d at 1186.
To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" as assessed from counsel's perspective at the time. Strickland, 466 U.S. at 688, 104 S.Ct. 2052. In this way, "hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made." Rompilla, 545 U.S. at 381, 125 S.Ct. 2456 (quotation omitted). In so doing, we determine "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Richter, 562 U.S. at 105, 131 S.Ct. 770. And "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Hooks, 689 F.3d at 1168 (quotation omitted); see also Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("[A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (quotation omitted)). "In other words, [counsel's performance] must have been completely unreasonable, not merely wrong." Byrd, 645 F.3d at 1168 (quotation omitted).
"[T]o establish prejudice, the defendant must show that, but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different." Michael Smith, 824 F.3d at 1249. "[I]n *1090 the capital-sentencing context, if the petitioner demonstrates that there is a reasonable probability that at least one juror would have refused to impose the death penalty, the petitioner has successfully shown prejudice under Strickland." Grant, 886 F.3d at 905 (quotation omitted). "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112, 131 S.Ct. 770. To assess "whether an inadequate investigation prejudiced a habeas petitioner, we reweigh the evidence on both sides, this time accounting for the petitioner's proposed additions," and "account for how the state would have responded to the omitted evidence." Postelle v. Carpenter, 901 F.3d 1202, 1217 (10th Cir. 2018) (quotation omitted), cert denied, --- U.S. ----, 139 S.Ct. 2668, 204 L.Ed.2d 1073 (2019).
In cases in which the OCCA has adjudicated a Strickland claim on the merits, our review of the OCCA decision is "doubly deferential" because "[w]e take a highly deferential look at counsel's performance through the deferential lens of [AEDPA]." Pinholster, 563 U.S. at 190, 131 S.Ct. 1388 (citations and quotations omitted). Applying, AEDPA deference, we must "determine whether reasonable jurists could agree with the OCCA that [Smith's] trial and appellate counsels acted reasonably." Johnson v. Carpenter, 918 F.3d 895, 900 (10th Cir. 2019). But, as explained supra, we do not apply this double deference to an unadjudicated Strickland prong if the OCCA's decision rests entirely on a single prong. See, e.g., Porter, 558 U.S. at 39, 130 S.Ct. 447.
2
The parties agree that the OCCA adjudicated the merits of Smith's ineffective assistance of counsel claims concerning Wright's testimony and the attendant video. See OCCA Resentencing and Competency Op. at 9-10 n.5. The OCCA addressed deficient performance and prejudice, holding both that Smith failed to demonstrate counsel's purported failings amounted to more than a strategic decision and that Smith failed to demonstrate the omitted materials are "of a character substantially different from the evidence that trial counsel ultimately chose to use," rendering their omission immaterial. Id. The OCCA also explained Wright had characterized her interactions with Smith as limited, and that the interview's persuasive force on the question of Smith's intellectual functioning was debatable. Id.
Smith nonetheless contends we should review these ineffective assistance claims de novo because the OCCA "misidentified" the allegations by holding Smith alleged mere strategic error rather than counsels' failures to investigate and prepare. He relies on Chadwick v. Janecka, 312 F.3d 597 (3d Cir. 2002), in which that court stated "if an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply." Id. at 606. Smith explains that he couched his ineffective assistance claim in terms of counsels' failure to develop, prepare, and investigate for trial.
But the OCCA need not accept an inaccurate characterization of a claim to adjudicate that claim on the merits. And the OCCA did not misconstrue Smith's claim by concluding that he alleges only an imprecise strategic decision by counsel. OCCA Resentencing and Competency Op. at 9-10. Smith does not and cannot dispute that his counsel was aware of Wright and the video testimony because counsel provided notice that she intended to present Wright at the competency and resentencing trials and intended to have her authenticate *1091 and sponsor the video recording in question. Any failure to present the evidence thus cannot amount to a failure to investigate; counsel merely chose not to present the evidence after investigating. The OCCA's presumption that counsel made an appropriate strategic decision not to present the evidence thus properly understands Smith's argument. See Burt v. Titlow, 571 U.S. 12, 22-23, 134 S.Ct. 10, 187 L.Ed.2d 348 (2013) (noting the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment" (quotation omitted)). Accordingly, because the OCCA sufficiently understood Smith's resentencing and competency ineffective assistance claims to have adjudicated those claims on the merits, we afford "both the state court and the defense attorney the benefit of the doubt" required by AEDPA. Woods v. Donald, --- U.S. ----, 135 S. Ct. 1372, 1376, 191 L.Ed.2d 464 (2015) (quotation omitted).
Applying this standard, we reject Smith's claim that counsel inadequately investigated and prepared for trial by failing to submit evidence of which counsel was fully aware. Smith submits an affidavit from his trial counsel, attesting that her failure to present Wright and the video was due to a "lack of investigation and preparation." We may not consider this affidavit on habeas review because it was not presented to the OCCA. Pinholster, 563 U.S. at 181, 131 S.Ct. 1388 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").[15] Smith conceded before the OCCA that trial counsel was aware of Wright and the video because counsel provided notice that she intended to present Wright and the video at the hearings in question.
This analysis would not change even were we to consider the affidavits submitted for the first time on habeas review. The affidavit from Smith's trial counsel during the resentencing and competency hearings states only that trial counsel could not recall why she did not call Wright to testify. Because, at best, the "evidence establishes that there is no discernable explanation for counsel's failure to call" the witness in question, Smith "most certainly ha[s] not overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." Sallahdin v. Mullin, 380 F.3d 1242, 1248-49 (10th Cir. 2004) (quotation omitted).
Smith contends the OCCA's deficiency determination is unreasonable because the OCCA declined to identify any strategic justification for the failure of his counsel to present Wright's testimony and the attendant video. But "[i]t should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." Titlow, 571 U.S. at 23, 134 S.Ct. 10 (quotation omitted). That presumption places "the burden to show that counsel's performance was deficient ... squarely on" Smith, id. at 22-23, 134 S.Ct. 10, and Smith fails to identify any support in the record to carry that burden. Moreover, after review of the video recording, we do not consider the OCCA's conclusion that the "persuasive force" of the evidence was "debatable," OCCA Resentencing and *1092 Competency Op. at 10 n.5, to be an "unreasonable determination," § 2254(d)(2).
Relying upon Bullock v. Carver, 297 F.3d 1036 (10th Cir. 2002), Smith also argues that an "objectively unreasonable" strategic decision may satisfy the deficient performance prong of the Strickland analysis. Id. at 1051. But Smith has failed to carry his burden to establish the objectively unreasonable nature of that decision in light of the OCCA's determination that the evidence was of little utility because of Wright's limited interactions with Smith and the debatable value of the video.[16]
Accordingly, we conclude that Smith has failed to demonstrate ineffective assistance of trial counsel for failure to call Wright as a witness to sponsor the introduction of the video interview of Smith. And because trial counsel's performance was neither deficient nor prejudicial for failing to introduce the evidence in question, Smith's ineffective assistance of appellate counsel necessarily fails. Johnson, 918 F.3d at 906 ("[B]ecause we conclude that trial counsel was not deficient ... [Petitioner's] auxiliary claim cannot succeed. Appellate counsel cannot be ineffective for omitting an unsuccessful issue on appeal.").[17]
IV
For the foregoing reasons, we REVERSE in part and AFFIRM in part the district court's decision denying Smith's § 2254 petition for a writ of habeas corpus. We REMAND with instructions to grant a conditional writ vacating Smith's death sentence and remanding to the State.

The Supreme Court formerly employed the phrase "mentally retarded," but now "uses the term 'intellectual disability' to describe the identical phenomenon," noting "[t]his change in terminology is approved and used in the latest edition of the Diagnostic and Statistic Manual of Mental Disorders." Hall v. Florida, 572 U.S. 701, 704, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). Recently enacted federal legislation known as Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010), mandates the use of the term "intellectual disability" in place of "mental retardation" in all federal enactments and regulations. We accordingly use the term intellectual disability throughout this opinion, although many of the sources cited employ the old terminology.

As we have previously observed, there is "some possible tension between" the language in Richter requiring federal habeas courts to grant AEDPA deference to the adjudication of claims, not arguments, and "the approach of Wiggins and its progeny where" we deny AEDPA deference to the "portion of a Strickland claim ... not reached by a state court." Grant, 886 F.3d at 910 (quotation omitted) (citing McBride v. Superintendent, SCI Houtzdale, 687 F.3d 92, 100 n.10 (3d Cir. 2012) ). But even after Richter, this court has denied AEDPA deference to the unadjudicated prejudice prongs of a broader Strickland habeas claim. See id. And so, too, has the Supreme Court denied AEDPA deference to the unadjudicated prong of a broader Atkins habeas claim. See Brumfield, 135 S. Ct. at 2282.
Moreover, Richter establishes only a rebuttable presumption that the state court has adjudicated a claim, or portions of that claim. See Wilson v. Sellers, --- U.S. ----, 138 S. Ct. 1188, 1195, 200 L.Ed.2d 530 (2018) ("Richter ... set[ ] forth a presumption, which may be overcome when there is reason to think some other explanation for the state court's decision is more likely." (quotation omitted)). Supreme Court precedent indicates the presumption of adjudication of an entire claim on the merits outlined in Richter is overcome as to components of that claim if, as in Wiggins, a state court decision explicitly rests its analysis on a particular prong of a claim without deciding the claim's other prongs. Porter, 558 U.S. at 39, 130 S.Ct. 447 (2009). In other words, the Richter presumption controls if a state court summarily resolves a claim without explanation, but the presumption is overcome as to unadjudicated prongs of a claim if a state court provides a reasoned explanation that rests exclusively on one prong of a multi-prong analysis. See Mann v. Ryan, 828 F.3d 1143, 1168 (9th Cir. 2016) ("This distinction between AEDPA review of summary denials and partial adjudications is apparent in post-Richter Supreme Court caselaw, which applies de novo review to unanalyzed portions of multi-prong tests."); Grueninger v. Dir., Vir. Dep't of Corr., 813 F.3d 517, 526 (4th Cir. 2016) ("[T]he Richter rule requiring deference to hypothetical reasons a state court might have given for rejecting a federal claim is limited to cases in which no state court has issued an opinion giving reasons for the denial of relief." (quotation and alteration omitted)).

Because the law of our circuit clearly states that a sufficiency of evidence challenge necessarily "presents a mixed question of law and fact," Hooks, 689 F.3d at 1165, and Smith presented a sufficiency of evidence challenge before the district court, we reject the State's contention that Smith forfeited § 2254(d)(2) arguments by failing to raise them expressly below.

In Grant, the majority concluded we may not sua sponte deny AEDPA deference when the OCCA purportedly "misunderstood" petitioner's argument. 886 F.3d at 909. That rule is inapplicable to our denial of AEDPA deference on a claim the OCCA plainly failed to reach. Id. at 932 n.20. In Grant, the dissent did not deny that the OCCA issued a decision on a particular claim for relief, and instead asserted the OCCA misunderstood petitioner's arguments on that question. See 886 F.3d at 968 (Moritz, dissenting) (explaining "[t]he OCCA misunderstood this argument" and then "rejected [it]"). Unlike in Grant, there is no OCCA determination on the adaptive functioning prong of the Murphy analysis to which we may defer.

Atkins is thus consistent with other areas of the law concerning medical diagnoses, which place similar emphasis on expert testimony. For example, the Supreme Court has recognized the importance of experts in diagnosing insanity for a defense in a criminal trial. Ake v. Oklahoma, 470 U.S. 68, 80-82, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

We cite to the Tenth Edition as the current AAMR at the time of Smith's Atkins trial in 2004.

Smith also attempts to present scores of 55 (WAIS-III) and 55 (WAIS-IV) obtained by Drs. Hall and Ruwe in 2005 and 2010, respectively. But these scores were obtained after Smith's Atkins trial, and were thus not presented to the OCCA. Under AEDPA, our "review is limited to the record that was before the state court," Pinholster, 563 U.S. at 180, 131 S.Ct. 1388, and we may not consider either score.

And experts on both sides believed Smith to be intellectually disabled before Atkins was decided. Although our opinion on Smith's first habeas petition concerned mitigation evidence rather than Smith's intellectual disability, we noted the strong evidence of his intellectual disability: "Smith is completely illiterate. Even the State's experts and prison doctors determined ... Smith's IQ to be in the mentally retarded or borderline mentally retarded range. His understanding and his emotional development and his ability to relate all seem to be fairly similar to what we would perceive to be a 12-year-old-child." Smith v. Mullin, 379 F.3d at 941 (citations and quotation omitted).

Dr. Hopewell addressed the discrepancy between the scores of 55 that Dr. Call and Dr. Hopewell obtained and the 65 Dr. Smith obtained, testifying that the scores are consistent because Dr. Smith administered the older version of the WAIS assessment that would have inflated Smith's score pursuant to the Flynn effect. As we explained in Hooks, under the Flynn effect, "if an individual's test score is measured against a mean of a population sample from prior years, then his score will be inflated in varying degrees (depending on how long ago the sample was first employed) and will not provide an accurate picture of his IQ." 689 F.3d at 1169. We need not rely upon the Flynn effect to conclude a reasonably jury would have been compelled to find that Smith met the intellectual functioning Murphy prong because every score placed Smith in the intellectually disabled range, but merely acknowledge its existence to refute any suggestion that the discrepancy between Smith's 1997 and 2003 scores support the conclusion that he malingered.

And we consider the reliability of a particular IQ assessment when reviewing a sufficiency of evidence challenge under AEDPA. See Hooks, 689 F.3d at 1170 ("Given the [uncontested] reliability problems associated with many of the scores and the strong reliability of the scores of 72 and 76 from [petitioner's] own experts, we agree that [petitioner] falls into a 'gray area.' ").

Because we conclude the OCCA's holding that Smith failed to meet the intellectual functioning prong constitutes a "decision that was based on an unreasonable determination of the facts," § 2254(d)(2), we have necessarily concluded that Smith has carried his Jackson burden. A reasonable jury would have been compelled to find that Smith satisfied the intellectual functioning Murphy prong. See Hooks, 689 F.3d at 1166 (explaining Jackson, as applied to the Atkins context, requires assessing "whether, viewing the evidence in the light most favorable to the prevailing party (the State), any rational trier of fact could have found [petitioner] not mentally retarded by a preponderance of the evidence" (emphasis in original)).

Although Dr. Call heavily criticized Dr. Hopewell's administration of the Vineland test directly to Smith, rather than a caretaker, it remains the only formal assessment of adaptive functioning conducted at the time of Smith's Atkins trial. And, as Dr. Hopewell explained, his analysis of Smith's deficits in adaptive functioning was not wholly reliant on the Vineland assessment, because he determined many of Smith's deficits to be manifest without testing, and thus "pathological." Dr. Hopewell also made efforts to independently verify or corroborate Smith's deficits by speaking with his nurse, prison guards, and his attorneys.

The testimony of Dr. Call, the State's primary expert witness, provides no such basis. Dr. Call acknowledged that the intellectually disabled can lie, hold a job, work hard, drive, cook, clean, use a telephone, marry, and love. To the extent the State would rely upon Dr. Call's testimony to refute Smith's showing of deficits in adaptive function, Dr. Call explicitly acknowledged that he did not assess Smith using any "standardized instrument," and could therefore not definitively testify to Smith's deficits in adaptive functioning.

We also need not address Smith's cumulative error argument for purported aggregated constitutional violations. "A cumulative-error analysis merely aggregates all the errors that individually have found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hanson v. Sherrod, 797 F.3d 810, 852 (10th Cir. 2015) (quotation omitted). Because we reverse only on Smith's claim that the Eighth Amendment prohibits his execution, there are no harmless errors to aggregate. Id. at 853 ("Because [petitioner] has failed to prove at least two errors, we have no occasion to apply a cumulative error analysis.").

Smith asserts on appeal that we may consider the affidavits of trial and appellate counsel because the OCCA never adjudicated Smith's allegations of deficient performance. This assertion fails for the same reason as Smith's efforts to free this claim from the confines of AEDPA deference: the OCCA's rejection of Smith's characterization of his claim does not preclude it from adjudicating that claim on the merits. And the OCCA plainly did adjudicate this claim on the merits, holding that Smith failed to satisfy either prong of the Strickland analysis. OCCA Resentencing and Competency Op. at 9-10.

Moreover, even if Smith's counsel performed deficiently, Smith fails to demonstrate the OCCA's prejudice determination was unreasonable. Smith contends the video renders obvious his humanity and intellectual disability, and emphasizes the uniquely persuasive nature of video evidence. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112, 131 S.Ct. 770. And Smith fails to demonstrate that the OCCA obviously erred in concluding the video recording did not present substantially different evidence of Smith's intellectual disability and humanity from the materials counsel did use at the resentencing and competency proceedings. See Johnson, 913 F.3d at 902 (concluding the omission of video evidence was not prejudicial because the jury had already heard significant testimony in support of the issue that the omitted video evidence would have bolstered).

Because we reject as unmeritorious Smith's ineffective assistance claim, we also reject as unnecessary Smith's request for an evidentiary hearing on the question.