FILED
United States Court of Appeals
Tenth Circuit

December 11, 2023

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RANDY SALGADO,

    Petitioner - Appellant,

v.

RICK MARTINEZ, Warden of the Otero
County Prison Facility; HECTOR H.
BALDERAS, Attorney General for the
State of New Mexico,

    Respondents - Appellees.

No. 23-2032
(D.C. No. 2:20-CV-00899-JCH-JFR)
(D. N.M.)

_____

**ORDER DENYING CERTIFICATE OF APPEALABILITY**\*
_____

Before **EID**, **CARSON**, and **ROSSMAN**, Circuit Judges.
_____

Randy Salgado, a New Mexico prisoner proceeding pro se, moves for a

certificate of appealability (COA) to appeal the district court's denial of his

28 U.S.C. § 2254 petition.  We deny a COA and dismiss this proceeding.

## I.    BACKGROUND & PROCEDURAL HISTORY

### A.    Allegations Against Mr. Salgado

In 2004, a New Mexico grand jury indicted Mr. Salgado on six counts:

---

\* This order is not binding precedent except under the doctrines of law of the case,
res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

1.  criminal sexual penetration of a child under age thirteen,[1] specifically, forcing "R.S." to engage in fellatio;

2.  criminal sexual contact of a child under age thirteen,[2] specifically, touching or applying force to R.S.'s vagina;

3.  criminal sexual contact of a child under age thirteen, specifically, touching or applying force to the vagina of R.S.'s older half-sister, "T.R.";

4.  criminal sexual contact of a child under age thirteen, specifically, touching or applying force to T.R.'s breasts;

5.  criminal sexual contact of a child under age thirteen, specifically, causing T.R. to touch Mr. Salgado's penis; and

6.  bribery or intimidation of a witness,[3] specifically, threatening T.R. if she reported what Mr. Salgado had done.

The indictment alleged these offenses occurred between October 29, 2000, and August 30, 2001.  Before trial, however, the parties stipulated to a new charging period: between March 1 and September 30, 2000.  The prosecution believed this was the timeframe in which: (i) R.S. and T.R. were both living with their mother, Christina Trebizo; and (ii) Mr. Salgado became romantically involved with

---

[1] *See* N.M. Stat. § 30-9-11.

[2] *See* N.M. Stat. § 30-9-13.

[3] *See* N.M. Stat. § 30-24-3.

Ms. Trebizo, thus giving him access to her daughters.  Given this timeframe, R.S. would have been five at the time of the alleged offenses, and T.R. would have been eight.

## B.    Trial

The case went to a jury trial in February 2005.

### 1.    Jury Selection

During voir dire, the prosecutor asked the venire panel, "[D]oes anybody ever remember a time in their life where they were bullied by somebody?"  R. at 324.  Some panel members responded and described experiences of physical and verbal bullying.  One panel member, "A.H.," asked to answer the question in private.  During that private session, she told the court and the attorneys,

> When I was five I was abused by a boy who was twelve.
> I was threatened and I couldn't tell anybody.  I have never
> told anybody.  So I'm telling you.  It wasn't a good
> experience.  And while I'm sitting here, while you're
> asking about being bullied, I'm sitting here, and I couldn't
> think of anything, you know, and then I thought, Oh, no.
> And my heart is pounding.  My palms are sweating.
> I mean, I was five and he was twelve.  It wasn't innocent.
> I didn't know what the heck he was up to.  And so from
> that point of view that's how I feel.

R. at 379.  The prosecutor followed up by asking A.H. if she thought she could put aside that experience and judge the case on the facts.  A.H. responded, "I think I could probably judge what the children said.  I can remember that as though it was yesterday, and so I think that—I think I could judge if they are telling the truth."  *Id.* The prosecutor then asked A.H. if she believed she could be fair and impartial, and

3

she responded, "Oh, yes.  This is my third, fourth, jury."  R. at 379–80.  But she also added, "[F]or ten years, if I had had a gun I would have shot [her abuser]."  R. at 380.

Later, when all jurors had been excused for lunch, the court heard the parties' objections for cause.  Several jurors who had experienced sexual abuse, or whose close relations had experienced sexual abuse, were excused for cause.  This included one juror whose daughter had been sexually abused.  Speaking of this juror, Mr. Salgado's attorney, Mr. Donald Kochersberger, said, "I can't imagine she would really be able to participate without [her prior experience] affecting her.  She said her blood pressure went up and [her] heart were [sic] racing and palms were sweating."  R. at 407.  The juror in question had said nothing to that effect.  The only juror who said something similar was A.H.

No party objected to A.H., and she was seated as a juror.

### 2.    Presentation of Evidence

Mr. Salgado's defense theory was mistaken identity, *i.e.*, the girls probably had been molested, but not by him, because he had never known their mother or either of them during the charging period.  In this light, the most important witnesses were T.R., Joe Baca (T.R.'s grandfather),[4] R.S., Tammy Borunda (a friend of Ms. Trebizo), and Mr. Salgado himself.

---

[4] T.R. was actually the stepdaughter of Mr. Baca's stepson, but they referred to each other as granddaughter and grandfather.

4

a.    *T.R.*

T.R. was thirteen years old when she testified, and her testimony was substantially as follows.  She had lived with her grandfather, Mr. Baca, for most of her life, but there was a time when she stopped living with Mr. Baca and instead lived with her mother (and her half-sister, R.S.) at her mother's home.  At first she did not remember how old she was at that time, but on cross-examination she agreed she was nine.

One day, T.R. was at home, watching TV with R.S., while her mother was at work.  Mr. Salgado—whom she identified as the defendant in the courtroom—was in the home, too, and this was the first time she had met him.  Mr. Salgado called T.R. and R.S. into their mother's bedroom and told both to undress, which they did.  He then touched T.R.'s vagina, followed by R.S.'s vagina.  After that, he grabbed T.R.'s hand and made her "touch [his penis] up and down."  R. at 222.  As he did so, "[h]e told [the girls] not to tell or he might do it again."  *Id.*  Eventually, he let the girls go.  Later the same day, T.R. told her mother (Ms. Trebizo) about what had happened, but her mother did not believe her.[5]

There were two more times T.R. remembered interacting with Mr. Salgado.  One was at "a [bail] bond place" where Mr. Salgado worked and where Mr. Salgado, Ms. Trebizo, and her two daughters once spent the night (for unexplained reasons).

---

[5] The record does not disclose how or when the event came to the prosecution's attention, although it could have been through Mr. Baca's wife, to whom T.R. reported the event sometime later (T.R. did not remember exactly when, and Mr. Baca's wife had since passed away).

R. at 224.  The other was when they all drove in Mr. Salgado's RV.  Those were not the days that Mr. Salgado molested T.R. or R.S.

### b.    *Mr. Baca*

Mr. Baca testified he had previously encountered Mr. Salgado only once.  That was in September or October 2000, when Ms. Trebizo was being evicted and could not support T.R.  Mr. Baca came to Ms. Trebizo's house to pick up T.R. (but not R.S.), and that's when he saw Mr. Salgado—whom he identified as the defendant in the courtroom—helping Ms. Trebizo pack up her things.

When asked on cross-examination about exactly when this event happened, Mr. Baca repeated it was "September, October [of 2000], somewhere around there." R. at 280.

### c.    *R.S.*

R.S. was nine years old at the time of trial.  When asked why she was there in the courtroom that day, she answered, "For Randy" who "used to live with my mom." R. at 186, 187.  However, although Mr. Salgado was present, she did not see the person she remembered as Randy in the courtroom.

As to the alleged crimes, R.S. said that Randy "made [her and her sister] take off our clothes, and he stuck his privates in my mouth."  R. at 189.  She also said she had been asleep in the living room when Randy put his privates into her mouth, after which she went to her mom's room, but it was in the living room where Randy asked her and T.R. to take off their clothes.

6

On cross-examination, Mr. Kochersberger (Mr. Salgado's attorney) elicited potential inconsistencies with a videotaped safehouse interview from eight months earlier. During that interview, R.S. had characterized Randy as tall and skinny with certain tattoos, whereas Mr. Salgado was 5'5" tall, weighed about 200 lbs., and did not have the reported tattoos.

### d.    *Ms. Borunda*

Ms. Borunda was one of Ms. Trebizo's friends. She testified she remembered Mr. Salgado's and Ms. Trebizo's first meeting, which happened at a small party on March 9, 2001. She said she remembered the precise date because her cousin got married the next day, March 10.

### e.    *Mr. Salgado*

Mr. Salgado testified that, during the charging period (March–September 2000), he was working as a bus driver and living with a woman other than Ms. Trebizo. Then, "around December [2000]," he began working for a bail bond agency. R. at 244. In March 2001, he met Ms. Trebizo through a person he bonded out of jail. He and Ms. Trebizo soon became romantically involved, but they broke up in 2002. The only one of her daughters he ever met was T.R. She was then living with Mr. Baca, but she came for an Easter weekend visit with her mother in April 2001.

### f.    *Ms. Trebizo's Prior Statement*

Just before jury selection, Mr. Kochersberger informed the court that his investigator had personally served a subpoena on Ms. Trebizo to testify, but

7

Ms. Trebizo was not willing to come. Mr. Kochersberger therefore asked for a material witness warrant, which the court issued.

On the day of Ms. Trebizo's expected testimony, Mr. Kochersberger informed the court that Ms. Trebizo was still refusing to appear and had gone into hiding. Mr. Kochersberger therefore moved in limine for permission to admit an unsworn statement Ms. Trebizo made at a bond hearing several months earlier. Over the prosecution's objection, the trial judge allowed Mr. Kochersberger to admit Ms. Trebizo's prior statement for its truth. The jury therefore heard Ms. Trebizo's claims that the accusations against Mr. Salgado were untrue. She said Mr. Salgado had never met R.S. and had never been in Ms. Trebizo's home while her daughters were living there. She also insinuated that her ex-husband (R.S.'s biological father) had convinced the girls to accuse Mr. Salgado, out of jealousy.

g. *Other Evidence*

The prosecution introduced documentary evidence from T.R.'s school and R.S.'s daycare that they were in their mother's care at least in August and September 2000, although T.R. returned to Mr. Baca's care in mid-September.

3. The Verdict & Sentence

The trial judge dismissed count 4 (alleging unlawful contact with T.R.'s breasts), but otherwise sent the case to the jury. The jury returned a guilty verdict on all remaining counts. The court sentenced Mr. Salgado to a 25-year prison term.

### C.    Direct Appeal

On appeal to the New Mexico Court of Appeals, Mr. Salgado argued, among other things,[6] that the jury had insufficient evidence to conclude he had access to R.S. or T.R. during the charging period.  The court rejected this argument, holding the jury's verdict showed they accepted the prosecution's theory of the timeline.

Mr. Salgado also argued juror A.H.'s presence on the jury violated his constitutional right to an impartial jury.  The court rejected the argument, stating it would not presume the victim of a sex crime should be disqualified from being a juror in a sex-crime case.

The New Mexico Supreme Court denied review of Mr. Salgado's direct appeal.

### D.    State Habeas Petition

In March 2008, Mr. Salgado, still represented by counsel, filed a petition for habeas relief in the state trial court.  The petition argued various theories of ineffective assistance of counsel, including:

- Mr. Kochersberger's investigation was inadequate because he could have tried to find the person with tattoos matching those described by R.S. (Mr. Salgado had since discovered Mr. Baca had at least one matching tattoo).

---

[6] In this order, we do not discuss theories Mr. Salgado asserted in prior proceedings that he does not continue to assert in his COA application.

- Mr. Kochersberger's trial presentation was inadequate because he could have introduced employment records and other evidence and testimony to bolster Mr. Salgado's testimony that he was a bus driver during the charging period, not a bail bondsman.

- Ms. Trebizo's testimony was crucial to the defense, so Mr. Kochersberger should have sought a continuance when she failed to appear.

Multiple substitutions of counsel delayed adjudication of Mr. Salgado's petition. The trial court held an evidentiary hearing on ineffective assistance of counsel in October and November 2019. The hearing featured six witnesses, including Mr. Kochersberger and experts retained specifically to give an opinion on his performance.

The trial court issued a written decision on Mr. Salgado's petition in April 2020. The trial court found that Mr. Kochersberger's decisions had been reasonable, given the circumstances. It therefore denied relief.

Mr. Salgado petitioned the New Mexico Supreme Court for review. That court denied the petition in July 2020.

### E.    Federal Habeas Petition

Mr. Salgado, now pro se, filed his § 2254 petition in August 2020 asserting the arguments described above (insufficient evidence, A.H.'s presence on the jury, and various ineffective-assistance theories). He further asserted two new theories:

10

- T.R. testified she saw Mr. Salgado touch R.S.'s vagina (the accusation underlying count 2), but R.S. herself did not testify Mr. Salgado touched her vagina. Allowing the jury to convict on count 2 was therefore a Confrontation Clause violation.

- Mr. Kochersberger was constitutionally ineffective for an additional reason, namely, he did not move to strike juror A.H. from the panel.

In response, the State pointed out that Mr. Salgado had not exhausted these new theories, but the State also explicitly waived exhaustion and asked the district court to reject the new theories on their merits.

The district court referred Mr. Salgado's § 2254 petition to a magistrate judge for a recommendation. The magistrate judge recommended accepting the State's waiver and addressing all asserted grounds for relief on their merits. As to the merits, the magistrate judge recommended denying the petition. Mr. Salgado timely objected but the district court overruled that objection, adopted the recommendation in full, and entered final judgment.

This appeal timely followed.

## II.    LEGAL STANDARD

As to the issues Mr. Salgado exhausted in state court, the district court's task was to determine whether the state court's legal rulings were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," and whether the state court's factual rulings were "based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As to the issues the district court ruled on in the first instance, its task was simply to "hear the merits of the unexhausted claims." *Harris v. Champion*, 48 F.3d 1127, 1131 n.3 (10th Cir. 1995).[7]

Our task now is to decide if any issue ruled upon in the district court merits a COA. *See* 28 U.S.C. § 2253(c)(1)(A). We may not issue a COA unless Mr. Salgado "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This means he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). And specifically as to the claims he exhausted in state court, our COA analysis must also account for the deference given to state-court decisions under § 2254(d). *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason.").

## III.   ANALYSIS

### A.   Sufficiency of the Evidence

#### 1.   Legal Standard and Prior Resolution

When a defendant claims the evidence at trial could not support a conviction beyond a reasonable doubt, the question for the reviewing court is "whether, after

---

[7] Mr. Salgado has not argued that the district court should have allowed him to pursue his unexhausted claims in state court first.

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The New Mexico Court of Appeals identified this as the proper standard of review.  *See* R. at 153.[8]  It then summarized the trial evidence, recognized the weaknesses and potential contradictions, reasoned the jury could accept the prosecution's theory over Mr. Salgado's theory, and held the evidence in favor of the prosecution's case supported the verdicts.  The district court employed the same reasoning when it denied habeas relief.

### 2.    Mr. Salgado's Overall Argument

In his COA application, Mr. Salgado reprises his claim that the jury could not have found beyond a reasonable doubt that he committed any crimes against R.S. or T.R. during the charging period because, in his view, the evidence showed he did not meet Ms. Trebizo or either daughter until months later.  He claims the issue deserves a COA because "no reviewing court has ever identified what evidence the jury may have, could have[,] or[] did rely on that established beyond a reasonable doubt that [he] was in a relationship with Christine Trebizo during the charging period."  COA Appl. at 6.

---

[8] The court cited New Mexico case law, not federal case law, but it nonetheless applied the proper standard.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that a state court need not cite federal case law so long as it does not contradict that case law).

13

"The [sufficiency-of-the-evidence] inquiry is based upon the entire record and the reasoning process actually used by the trier of fact, known or not, is not considered." *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003). Moreover, we need not decide if the New Mexico Court of Appeals adequately described the available evidence because the question is whether that court's "result[]" contradicted clearly established Federal law or was factually unreasonable, *see* 28 U.S.C. § 2254(d)(1), (2), not whether it discussed the issue in any particular manner, *see Harrington v. Richter*, 562 U.S. 86, 98 (2011). On our review of the record, the evidence provided a path for a rational trier of fact to find Mr. Salgado guilty beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

T.R. testified Mr. Salgado (the same person she identified as the defendant in the courtroom) molested her and R.S. during a timeframe when they were living with her mother. T.R. could not remember precisely when that was, but the prosecution introduced evidence, such as school and daycare records, that T.R. and R.S. were living with their mother in August and September 2000 (the last two months of the charging period). Mr. Salgado has never challenged that documentary evidence. In other words, T.R.'s testimony, if believed, established (1) Mr. Salgado molested her and R.S., and (2) he did so in Ms. Trebizo's home when T.R. and R.S. were living there. The documentary evidence then filled in the missing timeframe.

Mr. Baca's testimony also supported the timeframe. He testified he saw Mr. Salgado (whom he identified as the defendant in the courtroom) helping Ms. Trebizo move out of her house when he (Mr. Baca) came to take custody of

14

T.R. again.  The prosecution introduced evidence that this likely happened in mid-September 2000.  Thus, if the jury believed Mr. Baca, it further confirmed the prosecution's theory.

### 3.    Challenges to Mr. Baca's and T.R.'s Testimony

Mr. Salgado offers several reasons why Mr. Baca's and T.R.'s testimony was not enough to support a rational finding of guilt.  We address these arguments in turn.

### a.    *Mr. Baca*

Mr. Salgado says, "Even if Joe Baca believes he may have seen some one, possibly named Randy, at Christina Trebizo's residence during the month of October 2000, that does not establish that that individual had any interactions with R.S. and T.R. between March 01, and September 30, 2000."  COA Appl. at 9.  Two parts of this assertion require clarification.

First, the phrase "possibly named Randy" is an allusion to another part of Mr. Baca's testimony, where he stated he had heard of Mr. Salgado before the day he came to pick up T.R., but had never met him.  When he arrived at Ms. Trebizo's house, however, Ms. Trebizo's mother was there and she told Mr. Baca that the person helping Ms. Trebizo to move her things was Mr. Salgado.[9]

---

[9] Many pages later in his COA application, when elaborating on an argument for ineffective assistance of counsel, Mr. Salgado claims Ms. Trebizo's mother testified at trial and denied having met Mr. Salgado.  *See* COA Appl. at 28.  We cannot find the transcript of Ms. Trebizo's mother's testimony in the record, nor can we find any argument to the district court or the New Mexico courts about the significance of the mother's testimony.  We therefore do not consider this assertion.  *See United States v. Viera*, 674 F.3d 1214, 1220 (10th Cir. 2012) (in the § 2255 context, refusing to consider an argument raised for the first time in a request for a COA).

Second, the phrase "during the month of October 2000" does not accurately reflect Mr. Baca's testimony. Rather, he testified he came to pick up T.R. in "September, October, somewhere around there." R. at 280.

So clarified, Mr. Salgado's attack on the significance of Mr. Baca's testimony misses the mark. Whatever Mr. Baca may have known about Mr. Salgado before picking up T.R., and whatever may have been said to him on that day, he identified the defendant in the courtroom as the man he saw at Ms. Trebizo's house, and he identified the timeframe. Mr. Salgado is correct this "does not *establish* that [he] had any interactions with R.S. and T.R. between March 01, and September 30, 2000." COA Appl. at 9 (emphasis added). But, if believed, it *does* establish that Mr. Salgado was with Ms. Trebizo during September or October 2000, contrary to Mr. Salgado's testimony that they never met until months later. And recall, the prosecution's other evidence suggested Mr. Baca picked up T.R. in September 2000, within the charging period.

        b.    *T.R.*

Mr. Salgado says T.R. "testified that she was nine years old when she was abused. T.R. didn't turn nine until December 2000; after the charging period." COA Appl. at 10. He also says she "testified that when she met Mr. Salgado, he worked at the bailbonds company," and his employment records show he was working as a bus driver then—he did not work for the bail bond company "until November or December 2000; again, outside of the charging period." *Id.*

16

As to T.R.'s age (eight vs. nine), we agree there was a discrepancy. On direct examination, she did not remember her age; on cross-examination, she agreed with Mr. Kochersberger that she had been nine.

As to having "met" Mr. Salgado when he worked for a bail bond agency, we disagree with Mr. Salgado's characterization of the testimony if he means to say this is when T.R. first met him. On direct examination, the prosecutor elicited from T.R. the details of the alleged abuse and then had this exchange with her:

> Q.     . . . When this happened to you this day, was this the only time you met Randy, or were there other times?
>
> A.     I met Randy because he worked at a bond place.
>
> Q.     Uh-huh.
>
> A.     And we slept overnight there, my mom, my sister, and me and Randy. We slept overnight there, and then he had an RV, and we went driving in it.

R. at 224. In context, it is clear the prosecutor used "met" in the sense of "met with," not "first met." T.R. then echoed the prosecutor's choice of the word "met." It is unclear if she also meant to convey anything about the order of the instances in which she "met" Mr. Salgado.

Also, the significance of T.R.'s memory about Mr. Salgado "work[ing] at a bond place" heavily depends on whether the jury believed Mr. Salgado when he testified he began working for the bail bond agency "around December [2000]," R. at 244. This overlaps somewhat with his claim that Mr. Kochersberger was ineffective for failing to bolster his testimony with employment records. However, as we will explain when we address that claim directly, *see infra* Part III.D.3, those

17

records neither support nor undermine Mr. Salgado's testimony about when he started at the bail bond agency. There was no documentary evidence Mr. Salgado was *not* working at the bail bond agency during the charging period.

Still, we see the force of the argument. T.R. said she was nine years old at the time of the crimes (but she did not turn nine until December 2000, after the charging period), and she remembered Mr. Salgado's employment with the bond agency, which arguably reinforces his testimony that he did not work there until around December 2000. Other evidence supported this theory, including Ms. Borunda's claim she remembered the day in March 2001 when Mr. Salgado and Ms. Trebizo first met, and Ms. Trebizo's claim (in her prior statement read to the jury) that Mr. Salgado had never been in her home at a time when her girls were living there.

Ultimately, however, it was the jury's responsibility "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. And "a jury may believe a part of a witness' testimony, and disbelieve other parts." *Meek v. Martin*, 74 F.4th 1223, 1260 (10th Cir. 2023) (internal quotation marks omitted).

Here, the jury had to parse T.R.'s testimony. She testified Mr. Salgado abused her and R.S. when they were living with their mother. R.S. similarly testified, although with less detail, that Mr. Salgado abused her and T.R. in their mother's home. But T.R. also testified she was nine years old at the time of the abuse, and she did not turn nine until a few months after she stopped living with her mother.

The jury could have rationally resolved this conflict by deciding the abuse never happened, regardless of location or timeframe—the girls were making it up. But Mr. Salgado has never explained why the jury could not likewise rationally conclude T.R. and R.S. were telling the truth about the fact of the abuse and the location. And if the jury believed that much, it necessarily disregarded T.R.'s statement that she was nine years old at the time. That is a rational resolution of the conflict, given T.R.'s age at the time of the abuse and at the time of trial (over four years later).

If the jury could rationally accept the fact and location of the abuse, then other (uncontradicted) evidence established the timeframe when the girls lived at the relevant location, and the final piece was the identity of the abuser. T.R. provided that piece by identifying Mr. Salgado in the courtroom as the man who abused her and her sister.

4.    Summary

When a defendant raises a sufficiency-of-the-evidence challenge on direct appeal, the question is not whether the reviewing court is convinced of the defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could have been convinced, looking at all evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 318–19. And when a state court's resolution of a sufficiency-of-the-evidence challenge comes before a federal court in the § 2254 context, the question is not whether the federal court would have reached the same resolution, but whether that resolution was an unreasonable application of *Jackson* or

an unreasonable determination of the facts. *See Smith v. Sharp*, 935 F.3d 1064, 1074

& n.3 (10th Cir. 2019) (observing that a sufficiency-of-the-evidence challenge is a

mixed question of law or fact, so it implicates both § 2254(d)(1) and (d)(2)). These

"two layers of judicial deference" create a "high bar." *Coleman v. Johnson*, 566 U.S.

650, 651 (2012).

Mr. Salgado's arguments do not persuade us that he might overcome this high

bar. Therefore, the district court's refusal to overturn the decision of the New

Mexico Court of Appeals is not reasonably debatable, and we deny a COA on this

issue.

**B.    Confrontation Clause**

According to Mr. Salgado, R.S.'s inability to identify him in the courtroom as

her abuser, and her failure to testify that Mr. Salgado touched her vagina, means the

jury could only have convicted him of count 2 based on T.R.'s testimony. In these

circumstances, Mr. Salgado claims his Sixth Amendment right to confront the

witnesses against him was violated. We cannot agree.

The Confrontation Clause governs "admission of out-of-court statements

[against the accused]" and "restrictions imposed by law or by the trial court on the

scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985).

Neither situation was present here. In this case, R.S. and T.R. testified in person and

were subject to cross-examination without restriction. Thus, their testimony raised no Confrontation Clause question. We deny a COA on this issue.[10]

### C.    Jury Composition

Defendants have a due-process right to "a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). Mr. Salgado claims A.H.'s presence on the jury violated that right because A.H. had an implied bias. *See Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) (holding that implied bias may exist if "the juror has a personal connection to the parties or circumstances of the trial," or if there are "similarities between the juror's experiences and the facts giving rise to the trial"). According to Mr. Salgado, A.H.'s physiological reaction when she remembered the abuse from many years ago (heart pounding, sweaty palms) shows she likely had PTSD, so she "would not have been cons[c]iously aware of her inability to regulate the transference of her own unresolved psychological damage into the case before the court." COA Appl. at 17.[11]

---

[10] Mr. Salgado also appear to argue that T.R.'s testimony is insufficient under the *Jackson* standard to sustain his conviction on count 2. We reject that argument for the reasons explained in Part III.A.

[11] Mr. Salgado's arguments assume A.H. was the victim of sexual abuse, and he claims A.H. described the abuse as "similar" to the abuse experienced by T.R. and R.S. COA Appl. at 17. A.H. never made either claim. However, she *did* say: (i) she was "abused" (when the pending question was actually whether she was bullied); (ii) "[i]t wasn't innocent"; and (iii) at age five, she "didn't know what the heck [the abuser] was up to." R. at 379. We will therefore presume for argument's sake that A.H. was sexually abused.

The New Mexico Court of Appeals rejected Mr. Salgado's argument because it was not "willing to presume that the victim of a sex crime should be barred from participating as a juror in a trial involving wholly unrelated charges." R. at 160. To merit a COA on this issue, this result must be debatably "contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *see also Miller-El*, 537 U.S. at 336.

The New Mexico court did not cite case law, but its resolution reflects the only form of implied (or presumed) bias the Supreme Court has clearly acknowledged to be a possible disqualification, namely, "bias conclusively presumed as [a] matter of law" because of some objective circumstance. *United States v. Wood*, 299 U.S. 123, 133 (1936); *see also id.* at 134 (examining whether the Constitution prohibits government employees from sitting as jurors in criminal cases). Mr. Salgado points us to no Supreme Court case law clearly establishing that sexual abuse victims cannot sit as jurors on criminal trials involving sexual abuse.

Mr. Salgado instead asks the court to evaluate his claim under an implied bias theory based on the alleged similarity between the juror's particular experience compared to the allegations at issue in the case. This argument is unavailing. There appears to be no clearly established Supreme Court holdings against which to evaluate whether the state court reasonably handled a claim of implied juror bias based on similarities between the juror's life experiences and the accusations at issue in the case. *Cf. Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not an

22

unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (internal quotation marks omitted)).

To be sure, this court's *Gonzales* decision—applying the pre-AEDPA version of § 2254—recognized the sort of claim asserted here. *See* 99 F.3d at 987; *see also id.* ("Though a juror might honestly believe she can be impartial, she nevertheless may have such a close connection to the circumstances at hand that bias must be presumed." (internal quotation marks omitted)); *id.* at 989–90 (rejecting a categorical rule that rape victims cannot sit on rape trials and calling for "an approach that focuses more closely on the particular juror's experience"). But there, we relied on Supreme Court concurring opinions and circuit-level decisions, not Supreme Court holdings. *See id.* at 985–90.

Even if we assume the standards established in our case law reflect the law as clearly established by the Supreme Court, we see no basis for a COA. "The implied bias doctrine should not be invoked lightly. It must be reserved for those 'extreme' and 'exceptional' circumstances that 'leave serious question whether the trial court subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.'" *Gonzales*, 99 F.3d at 987 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 & n.* (1982) (O'Connor, J., concurring)) (brackets and ellipses omitted). Applying that principle here, we cannot say the state court's result was unreasonable in the circumstances. A.H. had a strong physiological reaction to the memory of her own abuse and she stated there was a ten-year timeframe when she would have killed her

23

abuser had she possessed a gun.  But a long time had obviously passed.  Her exact age is not disclosed in the record, but she was five at the time of the abuse and she was now old enough to have served on three or four juries.  *See id.* at 991 (noting that "the passage of a quarter-century [between the time a juror was raped and the time she sat on a rape trial] argues against presuming [the juror] was biased").  And, in light of her prior jury service, she assured the court she could be impartial.  She also opined that her experience might help her to decide whether T.R. and R.S. were telling the truth, thus showing her open-mindedness to the possibility the girls' testimony might not be trustworthy.  The deference we must accord to the state court would not allow us to overturn its decision on this record, so we deny a COA.

### D.     Ineffective Assistance of Counsel

Mr. Salgado's COA application asserts four theories of ineffective assistance of counsel.  This claim requires: (1) constitutionally deficient performance by the attorney that (2) prejudices the defendant.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

#### 1.     Failure to Strike A.H.

Mr. Salgado first argues Mr. Kochersberger was constitutionally ineffective because he "fail[ed] to move the trial court to strike A.H. for cause or to use a peremptory strike to prohibit A.H. from being seated as a juror."  COA Appl. at 21.

24

The district court denied relief on this claim because the "decision to strike or not strike a potential juror rests within the strategic decisions that are vested in trial counsel" and "reasonable explanations might exist for counsel's desire to have A.H. on the jury." R. at 2942, 2943.

We are not comfortable with this reasoning. As Mr. Salgado points out, there is a fair basis to suspect Mr. Kochersberger kept A.H. on the jury *mistakenly*, not strategically. He requested striking a different juror to whom he attributed statements about increased blood pressure and sweaty palms. But that juror never made those statements or anything like them. A.H., however, spoke of a racing heart and sweaty palms. Thus, Mr. Kochersberger may have intended to exclude A.H., instead of or in addition to the other juror.

Even so, we may deny a COA on any basis evident in the record, just as we may affirm on any basis evident in the record. *See Davis v. Roberts*, 425 F.3d 830, 834 (10th Cir. 2005). Here, although the district court resolved this on *Strickland*'s deficient-performance prong, we instead see no debatable issue on the prejudice prong, *i.e.*, whether A.H.'s presence on the jury caused prejudice to Mr. Salgado. The record before the court shows A.H. forthrightly disclosed a traumatic experience that (we will assume) had some similarity to the accusations at issue. But the record confirms she also understood her duty as a juror to be impartial. Mr. Salgado's theory that she "would not have been cons[c]iously aware of her inability to regulate the transference of her own unresolved psychological damage into the case before the court," COA Appl. at 17, is speculative. We therefore deny a COA on this issue.

25

2.     Failure to Investigate Mr. Baca's Tattoos

Before trial, R.S. stated in her safehouse interview that her abuser had a rose tattoo on his elbow. On the stand at trial, she denied having reported a rose tattoo.

The attorneys representing Mr. Salgado in his state habeas proceeding submitted a subpoena to the New Mexico Corrections Department for any records it had about Mr. Baca. The Corrections Department responded with a record showing Mr. Baca had been in prison in 1980 for forgery. The document described Mr. Baca's numerous tattoos, including a rose tattoo on the "[r]ight inter [sic] arm." R. at 433. Mr. Kochersberger, in his testimony at the habeas hearing, testified that "this would have been important information," had he known it at the time of trial. R. at 28.

Mr. Salgado argues Mr. Kochersberger was constitutionally ineffective because he did not adequately search for persons with tattoos matching those described by R.S. If he had, Mr. Salgado says it would have led him to Mr. Baca, who would have become the primary suspect.

In the district court, the State argued Mr. Salgado failed to exhaust certain theories in state court, but the State did not identify this as one of the unexhausted theories. Yet we cannot find where the state court ruled on this claim (although the parties obviously explored it in the evidentiary hearing). The district court, moreover, never identified the state court's ruling. It instead ruled that the state court's resolution of the various ineffective-assistance issues was entitled to deference.

26

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits," and is therefore subject to § 2254(d) deference. *Johnson v. Williams*, 568 U.S. 289, 301–02 (2013). "[T]hat presumption can in some limited circumstances be rebutted," *id.* at 301, but the burden of rebuttal falls on the habeas petitioner if he is seeking non-deferential (de novo) review, *id.* at 301–02. In the district court, Mr. Salgado never attempted to rebut the presumption, and he does not attempt to rebut the presumption in his COA application. Thus, the presumption of adjudication on the merits remains intact, and the question for the federal habeas court is whether "there was no reasonable basis for the state court to deny relief," *Harrington*, 562 U.S. at 98.

Under this standard, we see no basis for a COA. It is undisputed Mr. Kochersberger did not know Mr. Baca had a rose tattoo, or any other tattoos that might correspond to those R.S. described in her safehouse interview. Instead, he knew that R.S. had described a tall, skinny person with certain tattoos, and that Mr. Salgado was neither tall nor skinny, nor did he have the tattoos described by R.S. He put this information before the jury during R.S.'s cross-examination.

We do not doubt Mr. Kochersberger could have strengthened the case had he also found a person better matching R.S.'s description, but we cannot say the state court had no reasonable basis under *Strickland* to reject this claim.[12] The fact that

---

[12] Notably, there is no way to know if such an investigation would have led to Mr. Baca. Mr. Salgado says "the record suggests that as R.S.'s biological grandfather,

Mr. Salgado's habeas attorneys thought to investigate Mr. Baca—who had been *T.R.'s* guardian, not R.S.'s—does not show Mr. Kochersberger was objectively unreasonable in his own investigation. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). We therefore see no debatable issue, and we deny a COA.

### 3. Failure to Introduce Employment Records

Mr. Salgado next contends Mr. Kochersberger was ineffective because he did not bolster Mr. Salgado's testimony with employment records confirming he was a bus driver during the charging period. Mr. Salgado claims the employment records would have led the jury to believe he never worked at a bail bond agency during that timeframe, so T.R.'s memory of having met with Mr. Salgado at a bail bond place could not have been formed during the charging period. And this, in turn, suggests Mr. Salgado never knew Ms. Trebizo or her daughters during the charging period.

At the state habeas hearing, Mr. Kochersberger testified about the choice not to introduce employment records. He "felt that bringing in employment records could possibly bolster the testimony of the children and that there were gaps in

---

[Mr. Baca] had access to R.S. throughout the charging period." COA Appl. at 24. He cites nothing in support of either assertion. Mr. Baca testified that R.S. was his stepson's biological daughter, not his own biological relation. We can find nothing in the record suggesting Mr. Baca had access to R.S. (or T.R.) during the charging period, other than coming to pick up T.R. toward the end of that period.

employment that could have hurt Petitioner's defense." R. at 27. The state court held this was a reasonable strategic decision. The district court held this was not an unreasonable application of *Strickland*. We agree.

For a claim like this, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Mr. Salgado tells us why he thinks the employment records could have helped, but he does not attempt to demonstrate why Mr. Kochersberger had unsound reasons for choosing not to introduce them.

We have also examined the only employment records we can find in the appellate record. One is a letter from the City of Albuquerque stating it employed Mr. Salgado as a bus driver between March and October 2000. The other is a letter from a New Mexico state agency stating Mr. Salgado became a licensed bail bond solicitor in April 2001. Neither document shows Mr. Salgado was not working for a bail bond agency during the charging period. The latter document shows only when he became licensed, not when he began his employment. Mr. Salgado himself testified he began working for a bail bond agency in roughly December 2000, *i.e.*, before he became licensed.

The employment records have gaps, just as Mr. Kochersberger said. The district court's deference to the state court's resolution of this issue is not debatable, so we deny a COA.

#### 4.    Failure to Secure Ms. Trebizo's Testimony

Finally, Mr. Salgado claims Mr. Kochersberger was ineffective for failing to have Ms. Trebizo (the girls' mother) testify.  In state habeas proceedings, Mr. Salgado framed this claim as a failure to seek a continuance until Ms. Trebizo could be found—because, as it happened, she turned herself in on the material witness warrant nine days after trial.

The state court refused to deem this ineffective assistance because the trial judge held a hearing on the day of Ms. Trebizo's expected testimony and the transcript of that hearing shows the parties "reasonably believed Ms. Tre[b]izo had no intention of testifying and that there was no way to determine when she would be found."  R. at 35 (citing R. at 436–39 (transcript of trial court's hearing on this issue)).  Thus, in the state court's view, it would be impermissible hindsight bias to factor her reappearance into the analysis.  The state court also observed Mr. Kochersberger had convinced the trial judge to allow the jury to consider Ms. Trebizo's prior statement at the bond hearing for its truth.  Mr. Kochersberger deemed this to be even better than Ms. Trebizo's actual testimony, given she could not change or misremember anything on the stand and the prosecution could not cross-examine her.  The district court upheld this is a reasonable application of *Strickland*.

Mr. Salgado does not convince us there is a debatable issue here.  His COA application focuses on why, in his view, Ms. Trebizo's live testimony could have provided important details beyond the statement the jury heard, but he does not

30

explain why that raises a debatable issue about Mr. Kochersberger's performance. He ensured she was served with a subpoena and he obtained a material witness warrant. When she did not comply, he successfully sought introduction of a favorable statement that the prosecution could not cross-examine. Under these circumstances, we cannot say the state court unreasonably held this strategy was within the range of constitutionally permissible performance.

Mr. Salgado also argues that Mr. Kochersberger was ineffective for having "promised the jury that Ms. Trebizo would take the witness stand for the defense," and then failing to "deliver on that promise." COA Appl. at 26. The record does not contain a transcript of the opening statements. The record contains a transcript of closing arguments, however, and that transcript shows both sides alluded to Mr. Kochersberger having said something about Ms. Trebizo in his opening statement. However, those allusions, without more, do not confirm what actually was said. Regardless, Mr. Salgado did not raise this claim below, so we will not examine it for the first time in this proceeding. *See Viera*, 674 F.3d at 1220.

## IV.    CONCLUSION

We deny a COA and dismiss this proceeding. We grant Mr. Salgado's motion to proceed on appeal without prepayment of costs or fees.

Entered for the Court

Veronica S. Rossman
Circuit Judge